STATE EX REL. LINCOLN FIREPROOF WAREHOUSE COMPANY, Appellant, v. BOARD OF REVIEW OF THE CITY OF MILWAUKEE and another, Respondents.

*No. 442.   Argued June 5, 1973.—Decided June 29, 1973.*
(Also reported in 208 N. W. 2d 380.)

For the appellant there was a brief by *Alan H. Steinmetz* and *Foley & Lardner,* all of Milwaukee, and oral argument by *Mr. Steinmetz.*

For the respondents there was a brief by *James B. Brennan,* city attorney, and *Joseph H. McGinn,* principal assistant city attorney, and oral argument by *Mr. McGinn.*

WILKIE, J. One issue is dispositive of this appeal: Did the assessor and the board of review properly reject the sale price of the subject property as the best evidence of its fair market value?

This appeal involves the overall question of whether the assessor and the board of review properly applied the real estate tax valuation statute, sec. 70.32 (1),[1] in

[1] Sec. 70.32, Stats. "**Real estate, how valued.** (1) Real property shall be valued by the assessor from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value the assessor shall consider, as to each piece, its advantage or disadvantage of location, quality of soil, quantity of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and their value; but the fact that the extent and value of

arriving at the Lincoln assessment here. Appellant Lincoln contends that it shouldered its burden of proving that the sale of the subject property in 1969 by the Chicago, Milwaukee, St. Paul & Pacific Railroad Company was a fair, arm's-length transaction and established the fair market value of the property and improvements. The respondents, the board of review and the city of Milwaukee, contend the evidence surrounding the transaction establishes, as a matter of law, that it was not a normal arm's-length transaction and, therefore, was properly disregarded by the assessor and the board of review as an indicator of the fair market value.[2]

This case does not involve a general review of the reasonableness of the assessment, the rules for which were well set forth a century ago in *State ex rel. Pierce v. Jodon*.[3] Rather, the narrow question presented is whether the assessor properly disregarded the sale price paid by appellant for the subject property as an indication of its fair market value. Sec. 70.32 (1), Stats., requires an assessor to value real estate with the best information available at the "full value which could ordinarily be obtained therefor at private sale."[4] The very best of the "best information" of fair market value

minerals or other valuable deposits in any parcel of land are unascertained shall not preclude the assessor from affixing to such parcel the value which could ordinarily be obtained therefor at private sale. If on the assessment date occurring in 1957 or in any year thereafter any person other than a governmental unit of Wisconsin owns real estate in which a Wisconsin governmental unit has retained mineral rights, timber rights or an easement or any similar interest in such real estate, the value of any such retained right shall be eliminated in determining the assessable value of such property, and such retained interest shall be excepted in the assessment description of such land and in any notice, tax certificate or tax deed following from such assessment."

[2] The board of review did reduce, upon objection, the assessor's initial property valuation by $9,090.

[3] (1924), 182 Wis. 645, 647, 648, 197 N. W. 189.

[4] *Supra,* footnote 1.

has long been held by this court to be the actual fair sale of the property or similar property.[5] Recently in *State ex rel. Markarian v. Cudahy*, an appeal from a lower court judgment setting aside a real estate tax assessment, the chief justice, for a unanimous court, elaborated upon the rule as follows:

". . . Commonly stated, sec. 70.32 (1) requires real estate to be assessed at its fair market value which has often been defined as the amount the property could be sold for in the open market by an owner willing and able but not compelled to sell to a purchaser willing and able but not obliged to buy. . . .

"The 'best information' of such value is a sale of the property or if there has been no such sale then sales of reasonably comparable property. In the absence of such sales, the assessor may consider all the factors collectively which have a bearing on value of the property in order to determine its fair market value. However, it is error to use this method 'when the market value is established by a fair sale of the property in question or like property.' . . . The statutory rule of assessment of real estate is restricted to its sale value in the open market and is not concerned with its intrinsic value if the intrinsic value differs either more or less from the sale value. . . ."[6]

Since it is undisputed in the instant case that the assessor considered a number of factors in addition to the 1969 sale price of $250,000, this court must determine whether the evidence supports the determination that the sale price of the real estate did not adequately reflect the fair market value. In such review it is to be borne in mind that the burden of establishing the sale's

[5] *See e.g., State ex rel. Enterprise Realty Co. v. Swiderski* (1955), 269 Wis. 642, 645, 70 N. W. 2d 34; *State ex rel. Baker Mfg. Co. v. Evansville* (1952), 261 Wis. 599, 608, 53 N. W. 2d 795; *State ex rel. Northwestern Mut. Life Ins. Co. v. Weiher* (1922), 177 Wis. 445, 448, 188 N. W. 598.

[6] (1970), 45 Wis. d2 683, 685, 686, 173 N. W. 2d 627. *See also: State ex rel. Hensel v. Town of Wilson* (1972), 55 Wis. 2d 101, 105, 197 N. W. 2d 794.

fairness rests with the taxpayer challenging the assessment.[7] This principle was stated in *State ex rel. Evansville Mercantile Asso. v. Evansville* as follows:

"There was a contemporaneous sale of the property in question. That being so, the taxpayer still has the burden of showing that the sale was made under normal conditions so as to lead to the conclusion that the price paid was that which could ordinarily be obtained for the property. If those conditions are met there is no occasion to consider other factors and it is wrong to do so."[8]

The inquiry, therefore, is whether Lincoln carried its burden of showing the sale was made under normal conditions—that of a seller willing but not compelled to sell to a buyer willing but not compelled to purchase.[9]

At the hearing before the city of Milwaukee board of review held on September 22, 1971, testimony was heard from three witnesses: Leonard L. Oster, president of Lincoln; R. Peter Tanner, real estate manager for the Milwaukee Road; and Norman W. Steffen, district assessor of the sixth district for the city of Milwaukee.

---

[7] See, *State ex rel. Collins v. Brown* (1937), 225 Wis. 593, 596, 275 N. W. 455; *State ex rel. Hein v. Barron* (1958), 3 Wis. 2d 127, 131, 87 N. W. 2d 785.

[8] (1957), 1 Wis. 2d 40, 43, 44, 82 N. W. 2d 899.

[9] In *State ex rel. Collins v. Brown, supra,* footnote 7, at page 595, it was stated:

". . . Does the fact that this property was sold immediately after the assessment for a price materially less than the assessor's valuation so clearly establish the full value which would ordinarily be obtained at private sale as to demonstrate the incorrectness or inaccuracy of the assessor's judgment? We think not, unless such evidence is accompanied by a showing that the sale was made under such normal and usual circumstances as to lead to the conclusion that the price paid was that which ordinarily could be obtained at private sale. The relations and circumstances of the parties, as well as the purpose of the sale, have an important bearing on this question."

Oster testified on direct examination that his company and the railroad had been formerly associated by virtue of a thirty-two-year lease between 1940 and 1972. He stated that his organization had considered a variety of alternatives as the lease was about to expire. Among these alternatives were entering into a new lease, purchasing the subject property or moving to a new location. According to Oster, his organization viewed a number of new locations and went so far as to make an offer to purchase another property. Oster stated the asking price by the railroad company was "around" $275,000 which, he noted, his organization felt was too high. The agreed-upon price, according to Oster, was $250,000 and was, he noted, "a trifle high; but considering the number of years we've been there, we felt that it was a reasonable price."

On cross-examination Oster testified that there were other leases involved in the transaction. He mentioned there were four stores, display rooms or offices on the first floor and a "light" manufacturing plant on the second floor of the building. Oster testified that the use to which his organization put the property remained unchanged after the sale. When questioned about fire insurance he admitted the building was insured but could not remember for what amount. Oster further elaborated upon the nature of the buildings viewed for prospective purchase but could not recall the purchase price per square foot.

On redirect examination Oster testified, in response to questions by board members, that his organization had had the property appraised. The appraisal, he stated, was in the sum of $210,000. When asked about the details surrounding the transaction in terms of whether it was forced or whether both parties were satisfied with the sale, Oster stated:

"We started negotiations with the Milwaukee Road to either extend the lease or buy the property because our former lease was expiring.

". . .

"And we wanted to have sufficient time to either make some agreement or find another place. At the original meetings there was no agreement at all. They wanted a great deal more than we considered the property worth, and in the course of the meetings we got together on a price that we both agreed was mutually satisfactory. We felt that $250,000 might be a little high, but it was a reasonable price. We felt that anything above that, which we did have offers of, were turned down."

The next witness to testify before the board was R. Peter Tanner, the real estate manager for the Milwaukee Road since 1962, and an industrial engineer dealing with leasing, selling and purchasing railroad properties prior to that date. Tanner testified that preliminary discussions concerning the sale versus continued leasing of the property first occurred in 1965 and continued during the following four years. Tanner stated that during these negotiations two appraisals of the property had been made—one by the railroad staff and another by an independent appraiser, John Bach of Bach, Hiller & Swallow. The house appraisal valued the property, according to Tanner, at between $295,000 and $298,000 and the independent appraisal was $275,000. Tanner stated that prior to the commitment to Lincoln they had contacted "a number of brokers" and advised them the property was for sale. He admitted the railroad did not make a specific listing agreement with any broker but on cross-examination he elaborated this as standard company procedure. As a result of advising the real estate brokers The Milwaukee Journal Company indicated interest but after some discussion subsequently declined to make an offer to purchase on the ground the asking price of $300,000 was too high. Tanner also noted there were other offers which were "ridiculous" in his company's opinion.

When asked why the railroad sold the subject property, Tanner stated:

"Well, we have a program of review of all of our properties, and when we have especially a long-term lease with a shipper on the property who has a considerable investment in the property as far as maintenance of the building is concerned, taxes and so on and so forth, and when the property shows no particular potential for commercial or industrial redevelopment, we try to divest ourselves of this type of property.
"In other words, to obtain funds to purchase raw land for industrial development."

Tanner further stated that there were "absolutely none" when questioned about any circumstances which placed the railroad in a position where it had to dispose of the property. On the point that this was a completely voluntary corporate decision, Tanner further elaborated:

"Yes, it was a complete corporate decision because part of our procedure in selling the property entails obtaining the approval of the Sales Department, the Operating Department, the Engineering Department, and ultimately the Board of Directors of the Railroad Company and the Mortgage Trustees. The Chief Engineer of the Engineering Department, under our corporate structure, has to satisfy himself that we're obtaining fair market value for the property and that the disposal of the property will not be detrimental to the best interests of the railroad company's operation.
"We went through all these steps over a prolonged period of time, and the decision was made, corporate-wise, to dispose of the property."

When asked whether in his opinion the sale price of the subject property was the best price obtainable in the market at that time, Tanner responded "Yes."

On cross-examination Tanner further elaborated upon the railroad company's appraisals and the nature of its efforts to sell the subject property. Tanner stated that the staff appraisal was undertaken in 1968 or 1969 by a Mr. B. H. Bobbitt of the railroad's real estate depart-

ment. He reiterated the appraisal to be approximately $295,000 or $298,000. Tanner testified that he, Bobbitt and their superior had reservations about the accuracy of their appraisal and decided to seek outside professional advice. This appraisal was in the sum of $275,000. Regarding the nature of the railway company's efforts to dispose of the property, Tanner acknowledged there were no written offers but Lincoln's. Commenting upon the company's real estate policy, he stated:

"No, we—as corporate policy, we don't normally give listings per se to a particular broker. We circulate the word to all brokers advising them that the property is being considered for sale and if they have anybody interested in acquiring the property they should contact us. We would then honor their brokerage fee as such; but we do not bind ourselves to a confining listing."

Tanner further stated that in the instant case no brokerage fee, usually amounting to 10 percent on vacant land and six percent on improved land, was paid and that the entire purchase price went directly to the railroad.

In response to questions from board members, Tanner stated his company still serviced the subject property and, of course, derived an "economic benefit" for such service. Responding to a question concerning the well-known financial plight of most railroads and whether it would have an effect on the decision to sell and the sale value of the property, Tanner observed:

"Well, one of the major assets of most railroads in the country are their land holdings, and some railroads have embarked on programs of disposition of their land holdings to the extent—for instance, the Northwestern has retained Real Estate Research Corporation to appraise all their properties and they have gone in classified property which could be disposed of, which could be—without being detrimental to the best interests of the company and property that is required by the railroad company for operating purposes, and no doubt other railroads have done that.

"We, frankly, have not pursued that particular type of program despite the economic conditions that are facing all railroads in the country. In other words, we did not embark on a program to dispose of all of our real estate holdings per se. We make selective sales."

When asked why his company had not received more written offers to purchase, Tanner stated that several people inquired about the property but they were talking in the neighborhood of $70,000 to $100,000. He stated these "speculators" were obviously out of line with the actual value of the property and the railroad made it known it would not consider written offers in that range.

One final exchange pertinent to the instant controversy occurred between Tanner and counsel for Lincoln concerning the relationship between the railroad and the Lincoln company:

"Q. Mr. Tanner, except for the relationship of lessor and lessee between the railroad and Lincoln Fireproof Warehouse Company, there is not and never has been any financial connection or inter-dependence or any connection whatsoever, is that correct? A. To my knowledge that is, with the exception of the fact that we deliver them railcars and they pay the freight bills on the railcars.
"Q. But the railroad has no financial interest in Lincoln Fireproof Warehouse as such? A. None whatsoever."

The third and final witness to testify before the city of Milwaukee board of review was Norman W. Steffen, the district assessor of the sixth district of Milwaukee. Steffen testified extensively as to his method of assessing the Lincoln property which resulted in an estimated market value of $290,000. According to Steffen he analyzed the location, size and layout of the building and its special improvements such as an elevator, railcar opening and track, loading dock and shop space.

He ascribed to the building a cost of replacement of $780,490 and applied a 60 percent depreciation factor which resulted in a value of $312,200. This figure, Steffen testified, he "further decreased by an economic adjustment as related to the market value of similar type properties based on a comparative approach." According to Steffen he had a remaining value or "sound value" on the building of $243,200 to which he added the $46,800 land value, totaling the $290,000 estimated market value.

Steffen stated he also evaluated the property by a different method, the "income approach to valuation," and arrived at an estimated market value via such method of approximately $305,000. The assessor noted his estimated market value of the property in 1968 was $354,300. Upon objection, he stated, the board of assessors (board of review) reduced the estimated market value to $290,000. Steffen testified that, in his opinion, the fair market value of the property was "approximately $290,000." Steffen further stated that he was aware of the 1969 sale of the subject property to Lincoln and its $250,000 sale price.

Finally, on redirect examination Steffen was asked by counsel for the city of Milwaukee whether he felt that the amount of the sale should be adjusted upward where, as here, no real estate commission was paid— such commission representing usually six percent on improved land. Steffen responded as follows:

"I would say that would be correct, because most generally, while this would be merely an estimate on my part, I would estimate that in excess of 90 percent of the property sold in the city of Milwaukee would reflect a commission paid to a broker in the sale; and therefore, the 55 percent ratio would be reflective of a commission having been paid in the sale of the property."

Based on the foregoing testimony, the city of Milwaukee and the board of review contend the board's

decision is prima facie correct and must be affirmed unless it is arbitrary or dishonest.[10] While it is true that the board of review's decision is prima facie correct and the burden is upon the taxpayer to prove either the assessment's inadequacy or the normality of the real estate sale as reflecting the fair market value of the property,[11] it is not true that this court may reverse the board's decision only if it is arbitrary or dishonest. Such a standard of review applies only where the board and assessor have properly applied the statute in their assessment.[12] Where, however, the assessment is not made on the statutory basis, it must be set aside. As stated recently in *State ex rel. Boostrom v. Board of Review:*

"In addition, failure to make the assessment on the statutory basis is an error of law and correctable by the courts on certiorari. . . . If the trial court finds upon the undisputed evidence before the board that the assessment has not been fixed upon the statutory basis, the assessment should be set aside." [13]

Respondents further contend the evidence establishes, as a matter of law, that circumstances surrounding the sale establish the sale was not at arm's length and, therefore, could not be utilized as an indicator of fair market value. These circumstances include the railroad's interest in selling the building to a customer who would be interested in continuing the rail shipping business and the fact that no six percent real estate commission

---

[10] Respondents cite *State ex rel. Althen v. Klein* (1914), 157 Wis. 308, 311, 147 N. W. 373, and *State ex rel. Boostrom v. Board of Review* (1969), 42 Wis. 2d 149, 155, 166 N. W. 2d 184, which extensively quotes the rules of *State ex rel. Pierce v. Jodon, supra,* footnote 3.

[11] *Supra,* footnotes 8 and 9.

[12] *State ex rel. Garton Toy Co. v. Mosel* (1966), 32 Wis. 2d 253, 257, 258, 145 N. W. 2d 129; *Central Cheese Co. v. Marshfield* (1961), 13 Wis. 2d 524, 534, 109 N. W. 2d 75.

[13] *Supra,* footnote 10, at page 156.

had to be paid if the property were sold to Lincoln. It must be observed, however, that these factors go only to the "willingness" of the parties to deal and not to their "compulsion" to do so. The definition of clear market value consistently adhered to by the court is "the amount the property could be sold for in the open market by an owner willing and able but not compelled to sell to a purchaser willing and able but not obliged to buy." [14]

It cannot be denied that the parties to the 1969 real estate transaction were desirous of doing business with each other for all of the reasons outlined by respondents. Yet nothing in the undisputed evidence before the board indicates any compulsion to buy or sell the property. Neither of the two corporate entities was in "necessitous circumstances" which would cause the sale to be at a depressed price [15] and, while it might be argued that the railroad company made less than vigorous attempts to find other buyers, it is also true such was the railroad's corporate policy. That word of the railroad's desire to sell the property was received in the real estate community is evidenced by the number of low offers received by the railroad company.

This court has recently stated in the *Markarian Case* that sec. 70.32 (1), Stats., requires tax assessments of property utilizing the "best information" of the fair market value.[16] Where a "fair sale" of the property has occurred, it is error to utilize other evidence of intrinsic value in the assessment. A fair sale is defined

[14] *State ex rel. Markarian v. Cudahy, supra,* footnote 6, at page 685. *See also: Allen v. Chicago & N. W. Ry.* (1911), 145 Wis. 263, 265, 266, 129 N. W. 1094.

[15] *See Estate of Ryerson* (1941), 239 Wis. 120, 127, 300 N. W. 782.

[16] *State ex rel. Markarian v. Cudahy, supra,* footnote 6, at page 686.

as two parties willing but not compelled to transact. Since it is clear from the undisputed evidence in the instant case that the parties were willing but not compelled to transact, it follows that the sale was fair and the sale price did adequately reflect the fair market value. The assessor, the board of review, and the circuit court on certiorari erred in rejecting the sale price of the subject property as evidence of its fair market value. There is nothing in the record to support the conclusion that the sale was not an arm's-length transaction conducted by parties willing but not compelled to transact.

*By the Court.*—Judgment reversed.