326 S.E.2d 715

**Michael KLINE, et al.**

v.

**Jim McCLOUD, et al., etc.**

**No. 16042.**

Supreme Court of Appeals of
West Virginia.

Dec. 14, 1984.

Dissenting Opinion Jan. 8, 1985.

Jacqueline A. Kinnaman, W.V.E.A., Charleston, for appellants.

James E. Cain, Pros. Atty., J. Fred Queen, Elkins, Lee O. Hill and Charlotte R. Lane, Jackson, Kelly, Holt & O'Farrell, Charleston, for appellees.

MILLER, Justice:

This case involves the valuation of approximately 35,000 acres of timberland in the Middle Fork and Roaring Creek Districts of Randolph County, West Virginia owned by Westvaco Corporation (hereinafter Westvaco). The appellants are citizens and taxpayers of Randolph County who challenged the value of Westvaco's property, as set by the county assessor, before the Randolph County Commission, sitting as the Board of Review and Equalization (hereinafter Board of Review).[1] They sought to have the assessor's value placed on Westvaco's property increased to reflect its purchase price. Both the Board of Review and the circuit court concluded that deed values could not be used as evidence of true and actual value because there had been an appraisal of the property in 1965 by the State Tax Commissioner. We believe this ruling to be in error.

The facts are not basically in dispute. For the 1982 tax year, this land was valued at an average of approximately $13 per acre. The appellants contend that this valuation is far below the true and actual value of the land, as shown by the fact that Westvaco, by its deed values, paid more than eight million dollars for it.[2] They also

---

1. We recognized the right of taxpayers to challenge other taxpayers' property assessments in *Tug Valley Recovery Center, Inc. v. Mingo County,* 164 W.Va. 94, 261 S.E.2d 165 (1979). *See also In Re Tax Assessments Against Pocahontas Land Co.,* 172 W.Va. 53, 303 S.E.2d 691 (1983).

2. The term "deed values" refers to the declaration of consideration required under W.Va.

allege that approximately 7,670 acres owned by Westvaco were omitted from the tax books for 1982.

In February, 1982, the appellants applied for relief to the Board of Review, which set the matter for hearing. During the hearing, the appellants introduced deeds given to Westvaco by the McMullans, former owners of the land. One deed conveying 11,776 acres recited a consideration of $2,148,994, or approximately $180 an acre. A second tract covering 23,366 acres was subject to a lease purchase agreement involving a rental of $480,000 a year pending the purchase at a price of six million dollars, or approximately $260 an acre. The appellants also introduced entries from the 1982 land books for the tracts involved, showing that Westvaco's assessments on the various tracts ranged from a low of $9.60 per acre to a high of $33 per acre.

Westvaco admitted purchasing the property, and indicated that it paid $8,000 a year in taxes on the property. One of Westvaco's witnesses was Sherman Stalnaker, who had been the assessor of Randolph County for twenty-one years. He testified that he used a 1965 State Tax Department appraisal as the basis for his valuation, and that he did not change the valuation on property when it was sold. Under the 1965 appraisal, timberland was valued at $15 an acre. Mr. Stalnaker also stated that if he raised the value of Westvaco's land, he would have to increase the value on residential property in order to preserve equality of taxation.

Counsel for the appellants took issue with some of Mr. Stalnaker's statements, asserting that recent sale prices had been considered in valuing some property not belonging to Westvaco, and that the values on the appellants' properties were closer to true and actual value than the value on Westvaco's land. Counsel for both Westvaco and the appellants repeatedly urged the Board of Review to examine the tax records concerning other property in Ran-

dolph County. The Board refused, stating that the only issue properly before it was the true and actual value of Westvaco's property, and that evidence concerning the value of other property was irrelevant.

After hearing evidence and examining the various deeds submitted in this case, the Board of Review upheld the valuation used by the county assessor. Its ruling was affirmed by the Circuit Court of Randolph County.

## I.

■ Westvaco argues that we should affirm the decision of the lower court because there was substantial evidence to support the assessment. This, however, is not our traditional test for appellate review in tax assessment cases. We have historically utilized a two-pronged inquiry: first, whether there was sufficient evidence to support the circuit court's findings; and, second, whether there was an error of law. We summarized this rule in the single Syllabus Point of *In Re Assessment of Union Carbide Corp.*, 157 W.Va. 631, 203 S.E.2d 370 (1974):

" 'This Court will not reverse the order of a circuit court by which the valuation for taxation purposes of ... property was reduced on ... appeal, except [for] an error of law, or where the court's action was clearly not supported by a preponderance of the evidence.' Syllabus pt. 2, *Western Maryland Railway Company v. The Board of Public Works*, 124 W.Va. 539, 21 S.E.2d 683 (1942)."

*See also Application of Sprinkle*, 122 W.Va. 611, 11 S.E.2d 757 (1940); *Liberty Coal Co. v. Bassett*, 108 W.Va. 293, 150 S.E. 745 (1929).

In this case the lower court has acted under an erroneous conception of the law, i.e., that property cannot be appraised at a value greater than that set by the State Tax Commissioner under an old appraisal.[3]

---

Code, 11-22-6, in order to present a deed for recordation in the office of the clerk of a county commission.

**3.** The following conclusions of law appear in the lower court's order:

"2. The Assessor and County Commissioner are required to determine the value of any

As we have said in earlier decisions, determining "true and actual value" is the first step in taxing real property. *See* W.Va.Code, 11–3–1; *Killen v. Logan County Comm'n,* 170 W.Va. 602, 295 S.E.2d 689, 695 (1982); *Great A & P Tea Co., Inc. v. Davis,* 167 W.Va. 53, 278 S.E.2d 352, 355 (1981); *Tug Valley Recovery Center, Inc. v. Mingo County Comm'n,* 164 W.Va. 94, 261 S.E.2d 165, 173 (1979). "True and actual value" means fair market value—what property would sell for if sold on the open market. W.Va.Code, 11–3–1;[4] Syllabus Point 3, *Killen v. Logan County Comm'n, supra.* In determining the fair market value of a piece of land, a county assessor must "seek out all information which would enable him to properly fulfill his legal obligation." *In Re Shonk Land Co.,* 157 W.Va. 757, 761, 204 S.E.2d 68, 70 (1974).

We also said in *Shonk Land,* 157 W.Va. at 761, 204 S.E.2d at 70, that: "Although the assessor is under the supervision of the state tax commissioner he is not restricted in his search for information leading to the true and actual value of properties to questions formulated by that state official." In *Killen,* we reaffirmed that county assessors are not limited to following the State Tax Commissioner's appraisals, saying that:

"Similarly, we recognize that the statute uses the term 'a basis' in reference to use of the appraisal. Therefore, we interpret this term to mean that county assessors may consult other credible and reliable sources of information, *e.g.,* the property owner's *sworn* valuation and appraisal by bona fide appraisers, in determining the assessed value." 170

W.Va. at 618, 295 S.E.2d at 705–06. (Emphasis in original).

Furthermore, in *Crouch v. County Court of Wyoming County,* 116 W.Va. 476, 477, 181 S.E. 819, 819 (1935), we recognized that the price paid for real estate was a substantial indicia of its true and actual value, so long as the property changed hands in an arm's length transaction: "The price paid for property is not conclusive as to value, but it may be a very important element of proof where there has been an open transaction between competent parties dealing at arm's length as appears from the evidence herein." In many jurisdictions, evidence of current market value is given substantial, if not conclusive, weight. *See, e.g., Department of Revenue v. Anaconda Amer. Brass Co.,* 435 S.W.2d 65 (Ky.1968); *Schleiff v. County of Freeborn,* 231 Minn. 389, 43 N.W.2d 265 (1950); *W.T. Grant Co. v. Srogi,* 52 N.Y.2d 496, 420 N.E.2d 953, 438 N.Y.S.2d 761 (1981); *Conalco, Inc. v. Monroe County Bd. of Revision,* 50 Ohio St.2d 129, 363 N.E.2d 722 (1977); *Kem v. Department of Revenue,* 267 Or. 111, 514 P.2d 1335 (1973); *State ex rel. Lincoln Fireproof Warehouse Co. v. Bd. of Review,* 60 Wis.2d 84, 208 N.W.2d 380 (1973); 72 Am.Jur.2d *State and Local Taxation* § 759 at 84 (1974); Annot., 89 A.L.R.3d 1126 (1979).

Westvaco contends that in *Tug Valley,* we indicated that real property must be assessed at the amount established by the State Tax Commissioner. We do not believe that *Tug Valley, Killen,* or any of our other tax cases stand for the proposition that a tax assessor must always use the Tax Commissioner's appraisal no matter how old or erroneous it may be with regard

---

property in accordance with the evaluation determined by the appraisal of such property by the State Tax Commissioner.

\* \* \*

"4. The Assessor, the County Commissioner and even the Circuit Court must abide by the appraisal of the State Tax Commissioner in arriving at the assessed value of property.

\* \* \*

"9. The valuation placed upon the property by the Randolph County Assessor and upheld by the Randolph County Commissioner is, in the opinion of this Court, the proper valuation until it is changed by the State Tax Commis-

sioner or until another method of valuation is prescribed by the legislature."

**4.** W.Va.Code, 11–3–1, provides, in pertinent part:

"All property shall be assessed annually as of the first day of July at its true and actual value; that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be ascertained, is usually sold, and not the price which might be realized if such property were sold at a forced sale."

to an individual parcel's true and actual value.

*Tug Valley* dealt with a situation where the county tax assessor was utilizing an average assessed value of $18 an acre on certain coal property. The Tax Commissioner's 1977 coal appraisal summary indicated an average value per acre of $168. There was some evidence that a later summary had placed the average value per acre at $360. We held that the local assessor could not ignore the Tax Commissioner's appraisal. What we said in *Tug Valley* is that an assessor cannot establish a value for real property which is below the State Tax Commissioner's appraisal.

■ We pointed out in *Killen* that county assessors were not limited to the commissioner's appraisals and that they could "consult other credible and reliable sources of information, *e.g.*, the property owner's *sworn* valuation and appraisal by bona fide appraisers, in determining the assessed value." 170 W.Va. at 618, 295 S.E.2d at 706. (Emphasis in original). Regarding taxpayer objections to the valuation of property, we said that "[a]n objection to any assessment value may be sustained only upon the presentation of competent evidence, such as that equivalent to testimony of qualified appraisers, that the property has been under- or over-appraised by the tax commissioner and wrongly assessed by the assessor." *Id.*, Syllabus Point 8. We believe that the price paid for a parcel of land in a recent arm's length transaction is an indicator of market value on a par with the testimony of a qualified appraiser.

## II.

Westvaco argues that if its property were assessed at a higher value to reflect what it paid in acquiring the land, this would violate the equal and uniform taxation provision of our State Constitution, W.Va. Const. art. X, § 1[5] because recent sale prices have not been considered in assessing other property in the county. Westvaco attempted to show the Board of

Review that other property was valued from the Tax Commissioner's old appraisals, and such values were less than true and actual values. There was some dispute as to whether the tax assessor was utilizing deed values to update property values. None of these points were developed below by evidence because the Board of Review believed they were irrelevant.

The question is: May an assessor supplement the Tax Commissioner's appraisal report with information obtained from property owners or from recent deed values to determine the true and actual value of property without violating the equal and uniform provisions of our State Constitution?

Our research discloses very few cases dealing with this precise issue. In *Meyer v. Cuyahoga County Bd. of Revision*, 58 Ohio St.2d 328, 390 N.E.2d 796 (1979), a local board of education filed a petition with the county board of tax revision to have the Meyers' real estate reassessed to reflect its 1973 purchase price of $120,000. The property's value had been established at $43,410 by the county auditor's 1970 sexennial appraisal. The board of revision increased the value to $120,000.

The Meyers argued on appeal that using the purchase price rather than the sexennial appraisal figure violated equal and uniform taxation principles because other homeowners' properties were valued according to the sexennial appraisal.

The Supreme Court of Ohio noted prior cases in which it had "rather consistently held that the best evidence of true value is the actual sale price of the property in an arm's length transaction." 58 Ohio St.2d at 333, 390 N.E.2d at 799. The court went on to address the unequal taxation issue arising from the Meyers' claim that other property owners' values were based on the sexennial appraisal rather than deed sales, quoting from *Southern Ry. Co. v. Watts*, 260 U.S. 519, 526, 43 S.Ct. 192, 195, 67 L.Ed. 375, 387 (1923):

State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law."

---

5. This section states in pertinent part: "Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the

"The rule is well settled that a taxpayer, although assessed on not more than full value, may be unlawfully discriminated against by undervaluation of property of the same class belonging to others.... But, unless it is shown that the undervaluation was intentional and systematic, unequal assessment will not be held to violate the equality clause."

*See also Shaw v. Bd. of Revision of Cuyahoga County*, 70 Ohio St.2d 255, 436 N.E.2d 1033 (1982).

Finding no intentional and systematic discrimination, the court in *Meyer* refused to grant any relief, giving this general summary:

"The system of taxation unfortunately will always have some inequality and nonuniformity attendant with such governmental function. It seems that perfect equality in taxation would be utopian, but yet, as a practicality, unattainable. We must satisfy ourselves with a principle of reason that practical equality is the standard to be applied in these matters, and this standard is satisfied when the tax system is free of systematic and intentional departures from this principle." 58 Ohio St.2d at 335, 390 N.E.2d at 800.

The use of sale prices in reappraising property was also challenged on uniformity of taxation grounds in *Merlino v. Tax Assessors for Town of N. Providence*, 114 R.I. 630, 337 A.2d 796 (1975). In that case, the assessed value of the plaintiffs' house was increased from $12,300 to $18,900 when they purchased it in 1972. They argued that this increase was unconstitutional because there had not been a general revaluation of property in their community since 1960, and property which had not been sold since then had not been reassessed.

The court held that the plaintiffs could not make out a cause of action unless they could show that there had been "a systematic, intentional undervaluation of other property in the locality." 114 R.I. at 639, 337 A.2d at 802. This burden was not met merely by showing that other properties in the same area were not revalued in 1972. Instead, they had to show "that a substantial amount of property was taxed at a lower percentage of fair market value than their property." *Id.* Since they failed to meet this burden, the court denied relief.

The present case is somewhat analogous to those situations where an assessor makes a partial reappraisal of property which results in such property receiving a higher value than other property or there is disparate valuation between tax districts. Courts have rather uniformly rejected equal protection and uniformity of taxation arguments in such cases. In *Spooner v. Askew*, 345 So.2d 1055 (Fla.1976), for instance, the court refused to accept an equal protection argument where taxpayers in one county claimed their property was valued higher than the property in other counties.

In *In Re Hawaiian Land Co.*, 53 Hawaii 45, 487 P.2d 1070 (1971), *appeal dismissed sub nom. Hawaiian Land Co. v. Director of Taxation, State of Hawaii*, 405 U.S. 907, 92 S.Ct. 938, 30 L.Ed.2d 778 (1972), an assessor selected certain properties to be valued annually while others were valuated every two or three years. The annually valuated taxpayer claimed this resulted in a higher assessment on its property and constituted a violation of equal protection and uniform taxation, but the court rejected this argument.[6] The Idaho Supreme Court found no equal protection or uniform taxation problem where

---

**6.** The court in *Hawaiian Land Co.* cited *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480, 486 (1959), where the United States Supreme Court, in sustaining an Ohio property tax, stated: "Similarly, it has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it." (Citations omitted). More recently in *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351, 354–55 (1973), the Court stated: "Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." (Footnote omitted).

piecemeal reappraisals were made over a period of time with property being assessed at the new appraisal figure instead of waiting until all property had been reappraised. *Justus v. Bd. of Equalization*, 101 Idaho 743, 620 P.2d 777 (1980). This same result was reached in *Recanzone v. Nevada Tax Comm'n*, 92 Nev. 302, 550 P.2d 401 (1976).[7] *See also Melvin v. Dunn*, 607 P.2d 694 (Okla.1980); *State ex rel. Fort Howard Paper Co. v. State of Wisconsin Lake District Bd. of Review*, 82 Wis.2d 491, 263 N.W.2d 178 (1978); Annot., 76 A.L.R.2d 1077 (1961).[8]

Our constitutional requirement that taxes shall be equal and uniform has been discussed in a number of cases, but a clear syllabus point has not evolved. This can be demonstrated by reviewing the syllabi of our major property tax cases, all of which were overruled in part in Syllabus Point 4 of *In Re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959). *See, e.g., In Re Assessment Against the Southern Land Co.*, 143 W.Va. 152, 100 S.E.2d 555 (1957); *In Re Tax Assessment Against the National Bank of West Virginia at Wheeling*, 137 W.Va. 673, 73 S.E.2d 655 (1952); *Bankers Pocahontas Coal Co. v. County Court*, 135 W.Va. 174, 62 S.E.2d 801 (1950); *In Re Tax Assessments Against Charleston Federal Savings & Loan Ass'n*, 126 W.Va. 506, 30 S.E.2d 513 (1944), *aff'd*, 324 U.S. 182, 65 S.Ct. 624, 89 L.Ed. 857 (1945); *In Re Hancock County Federal Savings & Loan Ass'n*, 125 W.Va. 426, 25 S.E.2d 543 (1943); *Christopher v. James*, 122 W.Va. 665, 12 S.E.2d 813 (1940); *Charleston & Southside Bridge Co. v. Kanawha County Court*, 41 W.Va. 658, 24 S.E. 1002 (1896), *writ of error dismissed*, 168 U.S. 704, 18 S.Ct. 941, 42 L.Ed. 1212 (1897).

The lack of a clear syllabus point or statement of law summarizing what is meant by a violation of the equal and uniform taxation provision of our Constitution may be accounted for by the peculiar facts which influence the value of a given piece of property and by certain changes in our tax statutes. Prior to 1955, the method for determining the value of property was set out in W.Va.Code, 11–3–1, which used the phrase "true and actual value."

In pre-1955 cases where the taxpayer claimed that his property was assessed at a higher value than surrounding property, this Court would ordinarily refuse relief absent a clear showing of discrimination. "Such discrimination is not established where the showing is only that other property of a different type is assessed at less than its apparent or face value, through a process of estimation, and in a good faith effort to arrive at the true and actual value thereof." Syllabus Point 3, in part, *In Re Tax Assessments Against Charleston Federal Savings & Loan Ass'n, supra*. In a somewhat similar vein, we said in Syllabus Point 3 of *Bankers Pocahontas Coal Co. v. County Court, supra*, that:

"The valuation of land for purposes of taxation on the theory that such reduction in value is necessary in order to comply with the constitutional requirement of equality and uniformity will not

---

7. The court in *Recanzone* made this statement:

"Almost uniformly, the courts have upheld cyclical reappraisal programs against equal protection attacks. See, e.g., *Apex Motor Fuel Co. v. Barrett*, 20 Ill.2d 395, 169 N.E.2d 769 (1960); *Skinner v. New Mexico Tax Comm'n*, 66 N.M. 221, 345 P.2d 750 (1959); *Carkonen v. Williams*, 76 Wash.2d 617, 458 P.2d 280 (1969); *Perkins v. County of Albemarle*, 214 Va. 416, 200 S.E.2d 566 (1973)." 92 Nev. at 306, 550 P.2d at 404.

8. Although no argument is made in this case with regard to federal equal protection, we believe that under *Southern Ry. Co. v. Watts*, 260 U.S. at 526, 43 S.Ct. at 195, 67 L.Ed. at 387, federal equal protection principles are not violated by using deed values to establish fair market value over an old appraisal value of the Tax Commissioner.

In *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918), the taxpayer's mining property had been assessed at 100 percent of its value, while property was only assessed at one-third of full value. The United States Supreme Court recognized that "it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property." 247 U.S. at 352–53, 38 S.Ct. at 495, 62 L.Ed. at 1156. It concluded, however, that the evidence did not demonstrate an intentional violation.

be reduced in the absence of proof that there is a plan of valuation applied generally to the same species of property situate in the same taxing unit, and that such plan of valuation has not been adhered to in assessing the land upon which such reduction is sought."

In 1955, through the adoption of W.Va. Code, 18–9A–15 (1955),[9] the legislature specifically recognized that assessors could assess property at less than true and actual value.[10] Ever since then, Chapter 18 has contained a provision authorizing fractional assessments, although its location within the chapter and the minimum allowable percentage of true and actual value have varied from time to time.[11] As a result of these provisions, county assessors began systematically setting assessed value at less than true and actual value. This made it simpler for a landowner to challenge his assessment by showing that his assessed value was above the assessed value for other property. Thus, in *In Re Tax Assessments Against Pocahontas Land Corp.*, 158 W.Va. 229, 210 S.E.2d 641 (1974), the property owner complained that all Class III property in the county was assessed at 66 percent of its appraised or true value, while its property was assessed at 86 percent of its appraised value.[12]

Our most recent case dealing with the equal and uniform provision of our Constitution is *In Re Assessment of U.S. Steel*, 165 W.Va. 373, 268 S.E.2d 128 (1980). There, the local assessor arbitrarily set the 1977 value of the company's property above the State Tax Commissioner's 1976 appraised value by 8 percent and used this as the company's assessed value. Thus, the company was assessed at 108 percent of its true and actual value. In addition, the assessor utilized the 1976 Tax Commissioner's appraised values for all other coal companies, but set their assessed values at 68 percent of the tax commissioner's appraised value. We held that there had been a violation of our equal and uniform constitutional provision and concluded in Syllabus Point 3:

"Where there is intentional discrimination against a taxpayer by knowingly applying a different formula to the computation of its taxes from that generally used for all other taxpayers in similar circumstances, such discrimination cannot be excused as a sporadic deviation and the aggrieved taxpayer is entitled to have its taxes computed in the same manner and on the same basis as the favored taxpayers."

In *In Re Assessment of Kanawha Valley Bank*, this Court determined that the equal and uniform requirement was not limited to the same species of property, but would apply to all species of property.[13]

**9.** W.Va.Code, 18–9A–15, set minimum ratios of assessed to appraised value which increased from 35 percent for 1956 to 50 percent for 1959 and all succeeding years.

**10.** We do not doubt that prior to 1955 county assessors were assessing at less than true and actual value. Justice Fox, writing for a unanimous court in *In Re Charleston Federal Savings & Loan Ass'n*, 126 W.Va. at 521–22, 30 S.E.2d at 520, speaking of that practice, said:

"An assessor violates the law, and a portion of the taxpayers receive an advantage from such violation. When this occurs, other taxpayers naturally feel that they should be accorded the same treatment.... Is it not time to find some remedy for this situation, other than one involving an appeal to the courts to enforce a system of assessments for tax purposes which is plainly in violation of the law as written? It would be refreshing, indeed, if some taxpayer, or a group of taxpayers, would sponsor an effort to see that our tax laws are obeyed, rather than to take advantage of their open violation. It is not for this Court to point out ways by which regard for law may be required of public officials, but they exist. It is probably too much to expect that they will ever be used."

**11.** *See, e.g.,* W.Va.Code, 18–9A–3 (1958); W.Va.Code, 18–9A–3 (1960); W.Va.Code, 18–9A–4 (1961); W.Va.Code, 18–9A–11 (1971); W.Va.Code, 18–9A–11f (1981).

**12.** We held in Syllabus Point 3 of *In Re Pocahontas Land Corp.*:

"A systematic plan of assessing property whereby some property owners' assessments were increased 20% and other property owners in the same class were intentionally omitted from such increase is in violation of the equal and uniform taxation provision of Article X, Section 1 of the Constitution of West Virginia."

**13.** Syllabus Point 1 of *In Re Assessment of Kanawha Valley Bank* states: "Section 1, Article X,

Thus, a property owner could challenge his assessment on property not only by showing that the same species of property was being systematically assessed at a lower value, but also by showing that other types of property were being assessed at a lower value.[14] This case marked a departure from our prior precedents by holding that our constitutional equal and uniform inquiry was not limited to the same species of property involved in the tax protest.

In *Killen,* we were confronted for the first time with the question of whether our constitutional mandate that "all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law," W.Va. Const. art. X, § 1, prohibited assessments at less than true and actual value. We held that it did and, as a consequence, W.Va.Code, 18-9A-11, was held unconstitutional to the extent that it permitted fractional assessments.[15]

Following the *Killen* decision, Section 1b of Article X of our Constitution was adopted to authorize the assessment of property at 60 percent of its value, subject to the right of the legislature to establish a

higher percentage by a two-thirds vote.[16] This constitutional amendment also provided that for tax assessments beginning July 1, 1982, and until the first Statewide reappraisal is completed, "assessments shall be made under the provisions of the current statutory law." [17]

From this background several points emerge that are applicable to this case. First, property subject to our ad valorem tax is required to be appraised or valued at true and actual value. Second, assessed values, which are recognized under Section 1b of Article X are less than true and actual values. Third, the equal protection clause of the Fourteenth Amendment to the United States Constitution requires a taxpayer whose property is assessed at true and actual value to show more than the fact that other property is undervalued. He must demonstrate that the undervaluation was intentional and systematic. *E.g., Southern Ry. Co. v. Watts, supra; Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918).

---

of the Constitution of this State is clear and unambiguous and prohibits the taxing of any one species of property higher than any other species of equal value."

**14.** Syllabus Point 2 of *In Re Assessment of Kanawha Valley Bank* states: "The systematic assessment of money and shares of bank stock at a higher percentage of its true and actual value than that at which other species of property are assessed violates Section 1, Article X, of the Constitution of this State and is illegal." Further, Syllabus Point 6 states:

"Where there is a systematic plan to assess all property of a certain species at a particular per centum of its value, substantially less than actual value, a showing that there were sporadic variations to the plan of assessment will not deprive the owner of property of another species of his right to relief, under the provisions of Section 1, Article X, of the Constitution of this State, where the property of the latter was assessed at a substantially higher per centum of actual value than the approximate level of valuation of the other species of property of equal value."

**15.** Syllabus Point 6 of *Killen* states: "The percentage ratio scheme found in W.Va.Code § 18-9A-11 results in fractional assessment in violation of the West Virginia Constitution."

**16.** The relevant portion of Section 1b of Article X of the West Virginia Constitution is:

"Notwithstanding any other provisions of this Constitution and except as otherwise provided in this section, all property subject to ad valorem taxation shall be assessed at sixty percent of its value, as directed to be ascertained in this section, except that the legislature may from time to time, by general law agreed to by two thirds of the members elected to each house, establish a higher percentage for the purposes of this paragraph, which percentage shall be uniform as to all classes of property defined in section one of this article, but not more than one hundred percent of such value."

**17.** The complete text of this portion of Section 1b of Article X is:

"Notwithstanding the foregoing, for the first day of July, one thousand nine hundred eighty-two, and the first day of July of each year thereafter until the values may be fixed as a result of the first statewide reappraisal hereinafter required, assessments shall be made under the provisions of current statutory law, which is hereby validated for such purpose until and unless amended by the legislature. Assessment and taxation in accord with this section shall be deemed to be equal and uniform for all purposes."

■ We recognize that our cases under the equal and uniform mandate of Section 1 of Article X of our Constitution have utilized a somewhat similar rule although we have not precisely articulated it in a particular syllabus point. We, therefore, hold that the equal and uniform clause of Section 1 of Article X of the West Virginia Constitution requires a taxpayer whose property is assessed at true and actual value to show more than the fact that other property is valued at less than true and actual value. To obtain relief, he must prove that the undervaluation was intentional and systematic.[18]

■ We further hold that the price paid for property in an arm's length transaction, while not conclusive, is relevant evidence of its true and actual value. Such evidence may not be rejected in favor of a Tax Commissioner's old appraisal of the property. Consequently, we conclude that the trial court erred as a matter of law in concluding that the only proper measure of value was the 1965 property tax appraisal of the State Tax Commissioner.

Because this case was decided on an erroneous legal theory, we reverse the judgment of the circuit court and remand it for further consideration. We do not foreclose the parties from introducing relevant evidence regarding true and actual value, or the constitutional issue of equal and uniform taxation under the standards enunciated herein.

On remand, the circuit court should also consider the appellants' claim that 7,670 acres of land owned by Westvaco have never been placed on the tax books. Under W.Va.Code, 11–3–24, a county commission sitting as a Board of Review is required "to examine and review the property books, and ... add on the books ... the description and value of real estate liable to assessment which was omitted by the assessor." Such omitted property is subject to back taxes. W.Va.Code, 11–3–5. Although the appellants brought the alleged omission to the attention of the Board of Review, that body appears to have taken no action to correct it.

■ A final contention involves the ruling of the trial court that the 1982 Property Tax Limitation and Homestead Amendment foreclosed consideration of the valuation issue. We do not agree. First of all, this amendment which was ratified on November 2, 1982, speaks in terms of assessments "for the first day of July one thousand nine hundred eighty-two." [19] This would not affect Westvaco's July 1, 1981 assessment, which is at issue here. Furthermore, this provision recognizes that "until the values may be fixed as a result of the first state-

---

18. This rule has generally been adopted in other jurisdictions which have an equal and uniform provision. *See, e.g., Hamilton v. Adkins,* 250 Ala. 557, 564, 35 So.2d 183, 189 ("There must be a systematic and intentional discrimination before the state constitution is violated."), *cert. denied,* 335 U.S. 861, 69 S.Ct. 133, 93 L.Ed. 407 (1948); *Maricopa County v. North Central Dev. Co.,* 115 Ariz. 540, 543, 566 P.2d 688, 691 (1977) ("systematic and intentional" discrimination is required); *Northwestern Mut. Life Ins. Co. v. Suttles,* 201 Ga. 84, 107, 38 S.E.2d 786, 802 (1946) ("there must be a clear and affirmative showing that the difference is an intentional discrimination and one adopted as a practice"), *cert. denied,* 329 U.S. 801, 67 S.Ct. 490, 91 L.Ed. 685 (1947); *Interstate Oil Pipeline Co. v. Guilbeau,* 217 La. 160, 173, 46 So.2d 113, 117 (1950) (discrimination does not violate the state constitution unless it is "intentional, systematic, deliberate, persistent, habitual, fraudulent, and/or designed to violate fundamental constitutional principles, mere error in judgment or mistake being insufficient"); *Fisher Controls Co. v. Com-*

*monwealth,* 476 Pa. 119, 125, 381 A.2d 1253, 1256–57 (1977) ("deliberate, purposeful discrimination" is required; taxpayer must show "systematic, deliberate method of enforcement of the tax laws, and not mere errors or oversights"). Other courts utilize comparable language. *See, e.g., Twentieth Century Inv. Co. v. City of Juneau,* 359 P.2d 783, 785 (Alaska 1961) (intentional or systematic discrimination is required to violate the uniformity clause of Alaska's Organic Act); *Idaho Tel. Co. v. Baird,* 91 Idaho 425, 429, 423 P.2d 337, 341 (1967) (the uniform ad valorem taxation clause is violated when one class of property is systematically assessed at a higher rate of taxation); *Meadowland Ranches, Inc. v. Dept. of Rev.,* 277 Or. 769, 776, 562 P.2d 183, 186 (1977) ("arbitrary and systematic" discrimination is required); *Skinner v. New Mexico St. Tax Comm'n,* 66 N.M. 221, 223, 345 P.2d 750, 752 (1959) (must be "some well-defined and established scheme of discrimination, or some fraudulent action").

19. *See* note 17, *supra.*

wide reappraisal hereinafter required, assessments shall be made under the provisions of current statutory law, which is hereby validated for such purpose until and unless amended by the legislature." W.Va. Const. art. X, § 1b.[20] This provision clearly permits consideration of the issues in this case and the circuit court erred in holding otherwise.

For the foregoing reasons, the judgment of the Circuit Court of Randolph County is reversed and remanded.

Reversed and Remanded.

NEELY, Chief Justice, dissenting:

In this case the county assessor, the board of equalization and review, and the Circuit Court of Randolph County acted in accordance with our tax law as it was then written by a majority of this Court. The county assessor valued the Westvaco Corporation's timberland, not on its purchase price, but rather on the 1965 appraisal of the property by the State Tax Commissioner. This was upheld by the board of equalization and review. The circuit court, studying this Court's judgments and reading the West Virginia statutes, quietly and confidently affirmed the board.

Let us consider this Court's own language in *Tug Valley Recovery Center, Inc. v. Mingo County Commission,* 164 W.Va. 94, 261 S.E.2d 165 (1979). In that case, we considered "the problems inherent in setting the proper amount of tax to be paid on any given parcel of land." 164 W.Va. at 108, 261 S.E.2d at 173. Noting that such problems are peculiarly technical and complex, we discovered, to our relief, that our task is alleviated by *W.Va.Code* 18–9A–11(a) [1981]. In *Tug Valley Recovery Center, Inc., supra,* we indicated that, initially, the Tax Commissioner "is to make an appraisal of all mineral and surface estates in West Virginia, and *that appraisal is to serve as the basis for determining true and actual value for all assessment pur-*

*poses."* 164 W.Va. at 108, 261 S.E.2d at 173 [Emphasis in the original]. We continued:

Therefore, once the Tax Commissioner's appraisal has been made, the duty of the circuit court is clear and the taking of further evidence would not be necessary. It is incumbent upon the circuit court, as it would be upon the county commission and the assessor, to set the assessed value of all parcels of land at the amount established by the State Tax Commissioner. *Tug Valley Recovery Center, Inc.,* 164 W.Va. at 108, 261 S.E.2d at 173.

Today, however, the majority instructs us that *Tug Valley Recovery Center, Inc., supra,* signifies only that the local assessor may not ignore the Tax Commissioner's appraisal and that "an assessor cannot establish a value for real property that is *below* the State Tax Commissioner's appraisal" [emphasis added]. The majority now informs us that the price paid for property "is relevant evidence of its true and actual value ..." and "may not be rejected in favor of an old Tax Commissioner's appraisal." [Query: How old must the Tax Commissioner or his appraisal be?] Apparently an assessor may now appraise real property at a value *above* that determined by the State Tax Commissioner, perhaps even when that same property has declined in value over the years.

Previously, this Court has held that a taxpayer's objection to any assessment can be sustained only by the presentation of competent evidence by experts such as qualified appraisers. "The objecting party, whether it be the taxpayer, the tax commissioner or another third party, must show by a preponderance of the evidence that the assessment is incorrect." Syl.Pt., *Killen v. Logan County Commission,* 170 W.Va. 602, 295 S.E.2d 689 (1982). But in the case before us the majority turns a blind eye to its own directive. No neutral, independent appraiser offered any testimony at all to show that the assessment was "incorrect."

---

**20.** *See* note 17, *supra,* for full text. We wish to emphasize that this case has nothing to do with legislative enactments passed in 1983, relating to the reappraisal of property. W.Va.Code, 11–1A–1, *et seq.* (1983). Under W.Va.Code, 11–1A–2 and –8 (1983), the base year for the first statewide appraisal is 1983.

Syllabus point one gives another fine twist to the majority's veneration for precedent. *W.Va. Const.* art. X, § 1 states that taxation generally "shall be equal and uniform throughout the State ..." In Syllabus Point 1 of *Re: The Assessment of Shares of Stock of the Kanawha Valley Bank,* 144 W.Va. 346, 109 S.E.2d 649 (1959), this Court found the constitutional provision to be clear and unambiguous and to prohibit "the taxing of any one species of property higher than any other species of equal value." In subsequent cases, this Court held that unintentional, sporadic deviations were insufficient to reverse an assessment, *Bankers Pocahontas Coal Company v. County Court,* 135 W.Va. 174, 62 S.E.2d 801 (1950) and, recently, that intentional discrimination against a taxpayer could never excuse a willfully contrived deviation, Syllabus Point 3 *Matter of U.S. Steel Corp.,* 165 W.Va. 373, 268 S.E.2d 128 (1980).

The majority now insists that an aggrieved taxpayer, who finds his neighbors taxed less heavily than himself, is afforded no protection by the equal and uniform provision of *W.Va. Const.* art. X, § 1, unless he can satisfy the Court that the "undervaluation" of his neighbors "was intentional and systematic." The Court demanding such subjective omniscience, surgically eviscerates the equal and uniform requirement of our Constitution. Our equal and uniform provision governing taxes is sub-species of the equal protection clause. It guarantees that "insular minorities" like the business taxpayer in the case before us will not be taxed at a high rate because of limited political influence while all those with political clout pay little. Where taxes are equal and uniform everyone has an interest in efficiency and economy in government. One's compelling interest in such desirable social goals pales, however, whenever someone else is paying the bill.

More to the point in this case, however, is the fact that the record clearly reflects that all property in Randolph County is more or less appraised in accord with the tax commissioner's 1965 evaluation. If this property is evaluated by a different means—if the Court in this one specific case rejects application of an equal and uniform standard—then we will have reversed the role that this Court traditionally plays in tax cases. Although in all previous decades of our history this Court has been a guarantor of equality and uniformity, we are now, by this case, the proponents of deviation from equality and uniformity.

Although I am apparently eccentric in this regard, I believe that there is still some value in consistency and continuity. These are goals that are well served by cherishing the doctrine of *stare decisis.* In my dissent in *Killen v. Logan County Commission,* 170 W.Va. 602, 295 S.E.2d 689, 710–16 (1982), I argued that *stare decisis* not only protects reliance interests "but also that the doctrine helps provide a stable environment in which the institutions which apply laws can grow and change gradually." 170 W.Va. at 624, 295 S.E.2d at 712.

If the Court deems it necessary to disregard precedent, let it boldly overrule a prior decision and not, with passionate intensity, manoeuvre interstitially among the lines of cases written only yesterday. In conclusion, I am reminded of Lord Holt's protest, in 1704: "... these scrambling reports ... will make us appear to posterity for a parcel of blockheads." *Slayter v. May,* 2 Ld.Raym. 1072 [1704].