549 So.2d 1098 (1989)
Rebecca WALKER, As Palm Beach County Property Appraiser, and Allen C. Clark, As Tax Collector of Palm Beach County, Florida, Appellants,
v.
Donald J. TRUMP, Appellee.
No. 88-1309.
District Court of Appeal of Florida, Fourth District.
September 27, 1989.
*1100 Richard A. Kupfer of Wagner, Nugent, Johnson, Roth, Romano, Eriksen & Kupfer, P.A., West Palm Beach, for appellant Allen C. Clark.
Willa A. Fearrington, West Palm Beach, and Gaylord A. Wood, Jr., Fort Lauderdale, for appellant Rebecca E. Walker.
Elizabeth T. Maass and Robb R. Maass of Alley, Maass, Rogers, Lindsay & Chauncey, Palm Beach, for appellee.
WARNER, Judge.
From a final judgment in favor of Donald Trump which reduced the assessment on Mar-A-Lago, Trump's Palm Beach mansion, by $4,500,000, Rebecca Walker, Property Appraiser for Palm Beach County, appeals claiming error. We agree and reverse.
Mar-A-Lago, perhaps Palm Beach County's most famous piece of real estate for fifty or more years, was originally built by Marjorie Merriweather Post in 1927 and has served as a stopping point for heads of state, diplomats, and other famous leaders and celebrities. It is the largest single family residential property in the Town of Palm Beach. The main house consists of 34,764 square feet of living area which includes over 100 rooms with 17 bedrooms and 13 baths. Together with servants quarters and a six car garage, the total building area amounts to over 54,000 square feet. The mansion occupies grounds lying between the Atlantic Ocean on the east and the Intracoastal Waterway on the West. The grounds also include a pool, tennis court, citrus grove, and a pitch and putt golf course located along the intracoastal waterway.
The mansion was deeded in trust to the United States Government in 1972 but was given back to the Post Foundation by the government in 1981. The Foundation then determined to sell Mar-A-Lago and appointed a committee to effect a sale. An appraisal was obtained and showed the value of the Estate to be $12,000,000 for the real estate and $1,600,000 for the personal property. The asking price for the estate was $20,000,000. Several brokers were given listings, and it was advertised both nationally and internationally. During the next five years over 20 prospective purchasers viewed the Estate. While there were a number of offers, only three or four went to contract but did not close. All contract purchase amounts exceeded $12,000,000.
In August of 1985, Donald Trump offered to purchase the Estate for $8,000,000. With no better offers at that time, the Foundation contracted with Trump to purchase Mar-A-Lago for $8,000,000. The Foundation also assigned to Trump its $2,000,000 contract for the repurchase of the oceanfront tract between Mar-A-Lago and the ocean which the Foundation had sold in 1974. The closing for the two properties took place on December 27, 1985, and the closing statement showed Trump allocated $7,000,000 for the real property ($5,000,000 for Mar-A-Lago and $2,000,000 for the oceanfront tract) and $3,000,000 for the personal property.[1] There was no explanation *1101 for the $3,000,000 valuation of the personal property.
As of January 1, 1986, the Property Appraiser of Palm Beach County assessed the combined oceanfront tract and Mar-A-Lago for $11,500,000 based upon an appraisal prepared for Mrs. Walker by Michael Slade of Calloway & Price, Inc. Being dissatisfied with this valuation, Mr. Trump first protested the assessment to the Palm Beach County Property Appraisal Adjustment Board where he was denied relief. He thereupon filed suit in circuit court contesting the assessment and claiming that just valuation was no greater than the $7,000,000 price he paid for the property in December of 1985. He requested that the court determine that the appraisal was illegally excessive and for the court to determine that the proper assessment for the real property was $7,000,000. The property appraiser's answer denied these allegations and raised affirmative defenses.
At trial Mr. John Underwood, Mr. Trump's appraisal expert, testified that in his opinion, using the comparable sales approach appraisal method, the real estate was worth $8,100,000. Using five comparable sales, he computed a market value of $10,600,000 but then used a downward adjustment for "functional obsolescence due to superadequacy" of the mansion. In simple terms, the house was just too big and too expensive to maintain which reduced its value in his opinion.
Mr. Michael Slade, the appraiser hired by Mrs. Walker, testified that he had also used the comparable sales approach in reaching his valuation of $11,500,000. Using six comparables, five of which were the same comparable sales as Mr. Underwood used, Mr. Slade first calculated the price per square foot of enclosed area, main living area, and adjusted building area and then developed a range of values from which he made his ultimate opinion of value.[2] By using the lower end of the range of prices in each category and multiplying it by Mar-A-Lago's respective square foot-age in each category, Slade calculated that the value of Mar-A-Lago, less the oceanfront parcel, was $9,500,000. On cross-examination, it was revealed that instead of using the low end price per square foot in one of the categories to figure Mar-A-Lago's value, the third lowest per square figure was used. Had the lowest figure been used, the value according to that category would have been $7,300,000. However, Mr. Slade responded that even with that correction of the mathematical error, his opinion on value would not change given his analysis of other market data, the prior contracts on Mar-A-Lago, and his knowledge of the Palm Beach real estate market.
Mr. Slade testified that he also considered functional obsolescence in arriving at his opinion on value. But, he testified that he had never seen another appraiser use the methodology which Mr. Underwood used to determine superadequacy and noted that a reduction for superadequacy was used under the cost approach to valuation, not in the comparable sales approach.
Both appraisers agreed that Mar-A-Lago was unique and difficult to appraise. However, its uniqueness did not prevent them from using conventional comparable sales appraisal techniques, allowing for appropriate adjustments. Furthermore, each appraiser regarded the $7,000,000 sale to Mr. Trump as lacking in credibility because of the assignment of a $3,000,000 value to the furnishings which was not documented. Both further stated that the sale price of $7,000,000 for the real estate was below the fair market value.
Despite this uncontradicted evidence, the trial court found that Mar-A-Lago was so unique that "one sale does make a market." The trial court then analyzed the sale to Mr. Trump based upon the criteria of market value as set forth in a recognized appraisal text and determined that the sale met all the tests of market value. Therefore, the court determined that the *1102 fair market value of the estate and oceanfront property was the sale price, of $7,000,000. In doing so the court specifically rejected the appraisal prepared for the property appraiser because (1) Mr. Slade was not properly deputized according to section 193.024, Florida Statutes (1987) and (2) because of the mathematical error in the appraisal.
In challenging this final judgment the appellant raises two issues which merit discussion: (1) was Mr. Slade's appraisal unlawful because he was not deputized under section 193.024, Florida Statutes (1979)?; (2) did the court err in rejecting the property appraiser's valuation and then by itself reassessing the value of Mar-A-Lago to the amount of Mr. Trump's purchase price?

A. Legality of Appraisal.
The trial court held that Slade's appraisal was unlawful because Slade was not a deputized appraiser pursuant to section 193.024, Florida Statutes (1987). As appellee points out in his brief, the supreme court has held that there is no prohibition on the use of outside appraisers to assist the property appraiser in fulfilling her function, since such appraisals produced by outside firms are not binding upon the property appraiser but may serve as a guide. Freeze v. County of Pinellas, 146 So.2d 97 (Fla. 1962); State ex rel Glynn v. McNayr, 133 So.2d 312 (Fla. 1961). In this case the testimony shows that the report was submitted and then adopted by the property appraiser. Furthermore, a contract with an appraisal firm to reappraise property in the county does not constitute an unlawful delegation of authority by the assessor. Peters v. Hansen, 157 So.2d 103 (Fla. 2d DCA 1963). That being so, even if section 193.024, Florida Statutes (1987) required that the property appraiser administer an oath to Mr. Slade prior to his undertaking, which we do not decide, he is by his engagement, at the least, a de facto officer whose acts are valid and cannot be collaterally attacked by third persons. See, State ex rel Booth v. Byington, 168 So.2d 164 (Fla. 1st DCA 1964).
In fact Mr. Trump never challenged Mr. Slade's status in his complaint, the pre-trial statement, or at trial. The court on its own could not make Mr. Slade's status an issue. Lotspeich Co. v. Neogard Corp., 416 So.2d 1163 (Fla. 3d DCA 1982); Bobenhausen v. Boucher, 377 So.2d 31 (Fla. 1st DCA 1979). Therefore, the trial court erred in injecting this issue in the case and declaring Mr. Slade's appraisal "unlawful" because of his failure to be deputized under section 193.024, Florida Statutes (1987).

B. Rejection of Property Appraiser's Valuation and Reassessment of Mar-A-Lago.
The Florida Constitution, Article VII, Section 4 (1968) provides that "by general law regulations shall be prescribed which shall secure a just valuation of all property for ad valorem taxation... ." To effectuate this constitutional provision, the Legislature passed section 193.011, Florida Statutes (1979) which provides eight factors to be considered in deriving just valuation of property:
193.011 Factors to consider in deriving just valuation. In arriving at just valuation as required under s. 4, Art. VII of the State Constitution, the property appraiser shall take into consideration the following factors:
(1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length;
(2) The highest and best use of which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration any applicable local or state land use regulation and considering any moratorium imposed by executive order, law, ordinance, regulation, resolution, or proclamation adopted by any governmental body or agency or the Governor when the moratorium prohibits or restricts the development of improvement of property as otherwise authorized by applicable law;

*1103 (3) The location of said property;
(4) The quantity or size of said property;
(5) The cost of said property and the present replacement value of any improvements thereon;
(6) The condition of said property;
(7) The income from said property; and
(8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, including the costs and expenses of financing, and allowance for unconventional or atypical terms of financing arrangements. When the net proceeds of the sale of any property are utilized, directly or indirectly, in the determination of just valuation of realty of the sold parcel or any other parcel under the provisions of this section, the property appraiser, for the purpose of such determination, shall exclude any portion of such net proceeds attributable to payments for household furnishings or other items of personal property.
It is mandatory that the property appraiser consider each of these factors in appraising real property, Straughn v. Tuck, 354 So.2d 368 (Fla. 1977), although if inappropriate to the property in question, a factor may be disregarded. Palm Beach Development and Sales Corp. v. Walker, 478 So.2d 1122 (Fla. 4th DCA 1985); Vero Beach Shores, Inc. v. Nolte, 467 So.2d 1041 (Fla. 4th DCA 1985). The weight to be given each factor is within the discretion of the property appraiser. Straughn v. Tuck; Daniel v. Canterbury Towers, Inc., 462 So.2d 497 (Fla. 2d DCA 1984); Atlantic Intern. Inv. Corp. v. Turner, 383 So.2d 919 (Fla. 5th DCA 1980). This is so because appraising property is not a science, but an art. Powell v. Kelly, 223 So.2d 305 (Fla. 1969). The application of appraisal principles to any given property requires the exercise of judgment. Greater reliance on one factor or another may result in a difference in valuation. Because of this difficulty in valuation, and further because the appraiser is a constitutional officer, Article VIII, Section 1(b), the property appraiser is given great leeway in her assessments, so long as she follows in good faith the requirements of the law. District School Bd. of Lee County v. Askew, 278 So.2d 272 (Fla. 1973); Powell v. Kelly. If she does this, her assessment of value is presumed valid at all stages of proceedings to challenge it until it is overcome by sufficient proof to defeat every reasonable hypothesis of a valid assessment. Blake v. Xerox Corp., 447 So.2d 1348 (Fla. 1984); District School Bd. of Lee County v. Askew, 278 So.2d at 276-277; Vero Beach Shores, 467 So.2d at 1044.
The trial court determined that the appraisal upon which the property appraiser relied did not conform to the law because it reached a wrong result due to an incorrect computation. This is not supported by the record. The mathematical error made a difference in the range in values from which Mr. Slade derived his final conclusion. However, he testified that the difference did not change his opinion on value. To say that Mr. Slade was required to adopt the per square foot value which produced the lowest value out of his range of values, in contravention of other data which tended to place a higher valuation on the property, would limit the wide discretion the property appraiser is afforded in establishing valuation, including the discretion to discount any particular factor or give it the weight he thinks it deserves in determining value. Daniel v. Canterbury Towers, Inc.[3] Therefore, the mathematical error did not render the report unlawful or negate every reasonable hypothesis of a valid assessment, and the trial court erred in rejecting it on this ground. Blake v. Xerox Corp.
The trial court made no determination that the property appraiser's valuation was arbitrary or that the appraisal failed to consider the factors set forth in section 193.011, Florida Statutes (1987). Indeed, the testimony together with the appraisal report shows that each and every factor contained in the statute was considered. In fact, Mr. Underwood's appraisal and Mr. Slade's appraisal were similar in that each used the comparable sales approach, *1104 each used many of the same comparable sales, and each used the same three categories to establish a range of values. The difference between the appraisals was the additional deduction from the market price made by Mr. Underwood for the "superadequacy" of Mar-A-Lago. If this difference can be said to be a difference in methodology, then it was not for the trial court to consider which method was superior so long as the property appraiser's valuation took into consideration the statutory factors. Blake v. Xerox Corp.; Vero Beach Shores, Inc. v. Nolte, 467 So.2d at 1044. On the other hand, if this difference is a dispute over the weight to be given the various factors, namely the quantity or size of the property, its cost, and its condition, section 193.011(4), (5), (6), Florida Statutes (1987) then it is within the property appraiser's discretion to determine how much weight is to be accorded to each of those factors. Having shown that the property appraiser considered all of the statutory factors, the property appraiser's valuation should have been upheld by the trial court. Blake v. Xerox Corp. At most, Mr. Trump's expert's testimony supported a lower valuation based upon his methodology, but it did not prove that the property appraiser's valuation was arbitrary and had no reasonable basis whatsoever. Bystrom v. Bloom, 472 So.2d 819 (Fla. 3d DCA 1985). Thus, the trial court erred in invalidating the assessment of the subject property by the property appraiser.
In addition, the trial court's reassessment of Mar-A-Lago cannot be sustained even if the strong presumption in favor of the validity of the property appraiser's valuation had been overcome. First, it is not the trial court's function to substitute its judgment on valuation for that of the property appraiser. If errors of law result in rejection of the appraiser's evaluation, then the trial court should remand the matter for further action. Walker v. Hoffman, 464 So.2d 710 (Fla. 4th DCA 1985). Second, by determining that the sales price to Mr. Trump was the only true indicator of just valuation, the trial court impermissibly weighed one of the statutory factors more heavily and to the exclusion of all other factors. See Keith Investments, Inc. v. James, 220 So.2d 695, 697 (Fla. 4th DCA 1969). In Keith, this court stated:
Even more fundamentally, plaintiff's argument runs afoul of the principle that sales price, though one of the seven [now eight] statutory criteria, is not the only criterion. (Footnote omitted). In any assessment, some criteria will indicate a value in excess of the ultimate figure, while some will indicate a figure below the final evaluation. A showing that one or even several of the factors may indicate a value lower than the assessment will not suffice to exclude "every reasonable hypothesis of legal assessment."
Finally, while the trial court may determine the weight to be accorded to the experts' opinions, Blake v. Farrand Corp., Inc., 321 So.2d 118 (Fla. 3d DCA 1975), where the evidence is undisputed it cannot be ignored. See Clements v. Plummer, 250 So.2d 287 (Fla. 1st DCA 1971). In this case both appraisers testified that while the property was unique it did not defy conventional appraisal analysis. In fact, as stated before, both appraisers utilized largely the same comparable sales to establish value. The trial court erred in ignoring this uncontradicted evidence by finding that all appraisals could be disregarded. Furthermore, the trial court found that the $7,000,000 purchase price met all the criteria of market value even though both appraisers testified without contradiction that because of the reduction of the real property's sale price by the undocumented valuation of the personal property, the sale of the property to Mr. Trump was not a true indication of market value. As a result, the trial court erred in making its own assessment of valuation.
We therefore reverse the final judgment of the trial court and remand with directions to enter judgment in favor of the appellant property appraiser.
WALDEN and GUNTHER, JJ., concur.
NOTES
[1] In the initial contract for sale of Mar-A-Lago the purchase price of $8,000,000 had been allocated equally between personal property and real property.
[2] Mr. Underwood had also used this approach in determining the property's value prior to making his reduction for superadequacy.
[3] In addition the evidence showed that Mr. Slade's $9,500,000 value was consistent with an average of the low end valuations of each of the categories used.