No. 11-1768 - Charles R. Wright and Linda D. Wright v. Angela Banks, Jefferson County Assessor, et al.

**FILED**

**November 21, 2013**

**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

LOUGHRY, Justice, dissenting:

The Wrights purchased their four bedroom, two and one-half bath, 4260 square foot home for $234,000 and quickly insured it for $332,500 on the advice of their insurance agent who, according to Mr. Wright, "used the same software that . . . the Assessor's Office used to determine value. . . ." If this were not a clear indication that their purchase price did not reflect their home's true and actual value, then surely the Assessor's appraisal of their home at $372,400 for the prior tax year signaled its true and actual value. Nonetheless, the Wrights claim that the Assessor erroneously appraised their home for Tax Year 2011 at $355,167, arguing that "the price [they] paid . . . should have established the 'true market value' of their property for the tax assessment year ending June 30, 2010." While the majority has not gone so far as to agree with the Wrights' overly-simplistic proposition that purchase price should equal appraised value, it has erroneously determined that the Assessor did not "consider" the Wrights' purchase price in her comparable sales analysis, erroneously misinterpreted our law concerning which party bears the burden of proof, and erroneously concluded that the Assessor, the Board of Equalization and Review ("the Board"), and the circuit court committed reversible error by giving insufficient evidentiary weight to the Wrights' purchase price. In doing so, the majority has essentially turned a blind eye to the

1

Tax Commissioner's regulations and directives mandating the method by which real estate is to be valued by county assessors for ad valorem tax assessments in West Virginia, and has either ignored or misinterpreted our existing law regarding the evidentiary burden in taxpayer challenges to those assessments. Accordingly, I respectfully dissent.

## I. Ad Valorem Tax Assessments

Under article ten, section one of the West Virginia Constitution, "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value. . . . no one species of property for which a tax may be collected shall be taxed higher than any other species of property of equal value." Similarly, the Legislature has expressly stated that all property should be equitably and fairly valued in this State:

> (a) The Legislature hereby finds and declares that all property in this State should be fairly and equitably valued where it is situated so that all citizens will be treated fairly and no individual species or class of property will be overvalued or undervalued in relation to all other similar property within each county and throughout the State.
> • • • •
> (c) The Legislature finds that requiring the valuation of property to occur in three-year cycles with an annual adjustment of assessments . . . [is] an integral and indispensable part of a systematic review of all properties in order to achieve equality of assessed valuation within and among the counties of this state. . . .
> • • • •

> (d) The Legislature deems that the goal of this article is that . . . all property shall be annually assessed at sixty percent of its then current fair market value[1]. . . .

W.Va. Code § 11-1C-1, in part. While the Wrights have convinced the majority to be fixated on their purchase price, the discussion below demonstrates that the valuation of real property for ad valorem tax purposes in West Virginia involves much more than just a purchase price, which is necessary to fulfill both the constitutional and legislative mandate for fair and equitable valuation among all taxpayers statewide.

The Legislature has provided that "[i]n determining the fair market value of the property in their jurisdictions, assessors may use as an aid to valuation any information available on the character and values of such property, including, but not limited to, the updated information found on any statewide electronic data processing system network[.]"[2] W.Va. Code § 11-1C-7(b). In this same regard, the Legislature requires county assessors to

> maintain current values on the real and personal property within the county. In repeating three-year cycles, every parcel of real property shall be visited by a member of the assessor's staff who has been trained . . . to determine if any changes have occurred which would affect the valuation for the property. With this information and information such as sales ratio studies provided by the Tax Commissioner, the assessor shall make such adjustments as are necessary to maintain accurate, current

---

[1]*See infra* n.3.

[2]This is a reference to the Integrated Assessment System, which is a computer software program administered by the Tax Commissioner. This program is also referred to in the record and briefs as "CAMA." *See infra* n.7.

valuations of all the real and personal property in the county and shall adjust the assessments accordingly.

W.Va. Code § 11-1C-9 (2013) (footnote added). As the majority correctly states,

(a) All property . . . shall be assessed annually as of July 1 at sixty percent of its true and actual value,[3] that is to say, at the price for which the property would sell if voluntarily offered for sale by the owner thereof, upon the terms as the property, the value of which is sought to be ascertained, is usually sold, and not the price which might be realized if the property were sold at a forced sale.

W.Va. Code § 11-3-1 (2013) (footnote added); *see also* Syl. Pt. 3, in part, *Killen v. Logan Cty. Comm'n*, 170 W.Va. 602, 295 S.E.2d 689 (1982) ("Assessments of property for taxation purposes are based on the property's 'true and actual' value, W.Va. Code § 11-3-1 (1977) (Repl. Vol. 2008), which has been defined as 'its market value.'"), *overruled on other grounds by In re: Tax Assessment of Foster Foundation's Woodlands Retirement Community*, 223 W.Va. 14, 672 S.E.2d 150 (2008). In addition to West Virginia Code § 11-3-1 above, the majority cites West Virginia Code of State Rules §110-1F-2.24, which defines "true and actual value," in pertinent part, as "the price at or for which a particular parcel or species of property would sell if it were sold to a willing buyer by a willing seller in an arms length transaction without either the buyer or the seller being under any compulsion to buy or sell[.]" However, what the majority fails to acknowledge is that this regulatory definition

---

[3]"'True and actual value' means fair market value–what property would sell for if sold on the open market." *Kline v. McCloud*, 174 W.Va. 369, 372, 326 S.E.2d 715, 718 (1985) (internal citations omitted).

4

also contains the proviso that "***primary consideration shall be given to the trends of price paid for like or similar property in the area or locality wherein such property is situate[d][.]***"[4] [Emphasis added.]. As more fully discussed below, the Assessor in the case *sub judice* clearly and properly adhered to this requirement.

In furtherance of the constitutional and legislative mandate that all property be equitably and fairly valued, the Legislature has given the Tax Commissioner the authority to "[d]etermine the methods of valuation for both real and personal property. . . ." W.Va. Code § 11-1C-5(a)(2) (2013). In turn, the Legislature has expressly directed that all county assessors must "appraise all real and personal property in their jurisdiction at fair market value . . . utiliz[ing] the procedures and methodologies established by the Property Valuation Training and Procedures Commission[5] and the valuation system established by the Tax

---

[4] "'The function of a proviso in a statute is to modify, restrain, or conditionally qualify the preceding subject to which it refers.' Syl. pt. 2, *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985)." Syl. Pt. 1, *State ex rel. Browne v. Hechler*, 197 W.Va. 612, 476 S.E.2d 559 (1996).

[5] Through West Virginia Code § 11-1C-3, the Legislature created a Property Valuation Training and Procedures Commission (hereinafter "the Procedures Commission") whose membership includes the Tax Commissioner or his designee. The Procedures Commission has the power, *inter alia*, to

> [e]stablish uniform, statewide procedures and methodologies for the mapping, visitation, identification and collection of information on the different species of property, which procedures and methodologies shall include reasonable requirements for visitation of property, including a requirement

(continued...)

5

Commissioner." W.Va. Code § 11-1C-7(a) (2013). Accordingly, rather than focusing on a purchase price as the majority has done, it is imperative to consider the Tax Commissioner's methodology by which county assessors are to value real property in determining whether the Assessor erred in her valuation of the Wrights' home.

## II.  Tax Commissioner's Methodology

As directed by the Legislature, the Tax Commissioner has set forth the method by which county assessors are to appraise real property statewide in his Administrative Notice 2010-16 (Jan. 29, 2010) ("Administrative Notice"),[6] which was admitted into evidence in this matter before the Board.  This Administrative Notice clearly demonstrates that a property's value is more than just its purchase price.  The Administrative Notice

---

[5](...continued)
> that a good faith effort be made to contact any owner of owner-occupied residential property:  Provided, That the commission is not authorized to establish the methods to value real and personal property, but shall have the authority to approve such methods.

W.Va. Code § 11-1C-4 (a)(2) (2013).  In turn, the Tax Commissioner is directed to provide periodic training sessions concerning the basic criteria set by the Procedures Commission "of a continuing education nature for all assessors and appropriate staff members" at least once each year.  W.Va. Code § 11-1C-6(a) (2013).

[6]The State Tax Department's website reveals that this same Administrative Notice is issued annually.

describes the Integrated Assessment System (hereinafter "IAS"),[7] which is the software

program that is accessed statewide through computers in each county assessor's office.[8] As

the Administrative Notice explains,

> [t]his software provides for the entry of data by the local Assessor concerning "comparable sales" of land in particular "neighborhoods" in the county and then prices the value of this land on a "price per front foot or square foot" or by acreage.

The Administrative Notice directs county assessors to identify valid arm's length sales, which

are then used to generate a price per square foot in the tax neighborhood[9] that is "applied to

---

[7]The authority for the implementation of the IAS is found in West Virginia Code § 11-1A-21(a) (2013), which provides, in pertinent part, that the "Tax Commissioner shall devise and cause to be established a statewide electronic data processing system network, to facilitate administration of the ad valorem property tax on real and personal property, through the timely sharing of property tax information among county assessors and the Tax Commissioner." The IAS is the software referred to in the record and the appellate briefs as "CAMA." *See* 189 C.S.R. § 3-18.8 ("The CAMA system for West Virginia is called the Integrated Assessment System (IAS)."); *see also Mountain America, LLC v. Huffman*, 224 W.Va. 669, 675, 687 S.E.2d 768, 774 (2009) ("[The Assessor] then entered the neighborhood information into the real estate mass appraisal software (CAMA) . . . . Once all of the information was entered into the CAMA software, the residual property value for the neighborhood was calculated[.]"). The CAMA software contains a replacement cost feature for structures that allows the county assessor to enter data concerning the details of the improvements to the land and then prices the improvements utilizing construction cost data particularized for each county based on current construction costs.

[8]While the Wrights argue that the Assessor erred by utilizing the CAMA software in valuing their home, the use of the CAMA software is mandated by statute. W.Va. Code § 11-1A-21(b). Further, the Tax Commissioner's Administrative Notice sets forth the data that the Assessor is to enter into the CAMA program, which then prices the improvements utilizing construction cost data particularized for that area of the State.

[9]*See Mountain America, LLC v. Huffman*, 224 W.Va. 669, 675 n.3, 687 S.E.2d 768, 774 n.3 (2009) ("Pursuant to State Tax Department Administrative Notice 2006–16 (Jan. 31,
<span style="float:right">(continued...)</span>

7

each lot or parcel in the neighborhood . . . to arrive at an appraised value for the land . . . . [which] will reflect market value for the subject land." The Administrative Notice also directs the assessor to identify those sales where the consideration paid for a property may have been influenced by factors, such as foreclosure, so that they may be excluded from the calculations.[10]

The Administrative Notice also addresses improvements situated on real estate and expressly states that the "[f]ield data collection is the key to 'pricing' an improvement[,]" and that such data is to be recorded for each property, including its dimension, the type and style of the structure, the total number of rooms, bedrooms, family rooms, plumbing, finished basement living area, heating, attic, physical condition, cost and design factor, and its "CDU" (condition, desirability and utility factor).[11] The Administrative Notice also describes the

---

[9](...continued)
2006), a 'neighborhood' is defined as a 'geographical area exhibiting a high degree of homogeneity in residential amenities, land use, economic and social trends, and housing characteristics.'").

[10]Although the Wrights argue that it is unfair for the Assessor to unilaterally determine which sales are to be excluded for purposes of calculating the average sales price of homes during the look-back period, the Administrative Notice discussed herein expressly directs the Assessor to do so.

[11]The Procedures Commission's regulations, in particular Title 189, Series 2 of the West Virginia Code of State Regulations, address the statewide procedures for visiting property and collecting data. Regulation § 189-2-4 sets forth recommended residential data collection procedures so as to "achieve maximum production in the data collection of residential properties . . . [,]" and Regulation § 189-2-5 contains a data collector's checklist
(continued...)

8

manner in which this data is to be entered into the IAS, which then generates the depreciated

replacement cost value, or market value, of the improvements. The Administrative Notice

concludes by stating that

> [t]he appraised values for improved real property thus
> determined are compared to the arms-length selling prices of
> properties that have recently sold to develop an appraisal/sales
> ratio for each neighborhood.[12] Results from the appraisal/sales
> ratio are analyzed and neighborhood-pricing factors adjusted to
> bring the ratio in each neighborhood to within 10% plus or
> minus of average selling price.

[Footnoted added.].

### III. The Assessor's Valuation

With the Tax Commissioner's mandated methodology in mind, let us consider

the Assessor's evidence in the record before us to determine whether she followed this

methodology in valuing the Wrights' home.[13] June Bowers, the Assessor's senior tax

---

[11](...continued)
and describes the manner in which a data collector is to investigate and record information
concerning the property.

[12]*See supra* n.9.

[13]West Virginia Code § 11-1-6 (2013) provides, in pertinent part, as follows:

> The Tax Commissioner shall also, by letter or printed circular,
> give such instructions to the assessors respecting their duties as
> may seem to him judicious; and if any assessor fail to obey such
> instructions, so far as they are not contrary to law, he shall
> forfeit not less than one hundred dollars nor more than five

(continued...)

appraiser with more than twenty-five years of experience, testified before the Board concerning the appraisal of the Wrights' home. Ms. Bowers explained that the Assessor considered ten home sales in the Wrights' tax neighborhood during the look-back period.[14] Three of those sales, which were foreclosures and, therefore, not arm's length transactions, were excluded from the Assessor's comparable sales calculations per the directive in the Administrative Notice. Regarding the seven sales in the Wrights' tax neighborhood during the look-back period, which were included in the Assessor's calculations, Ms. Bowers explained that those sales were all "pricing" around the same value with a low of $210,000 for a home containing 2,650 square feet to a high of $350,000 for a home containing 4,296 square feet. This larger home approximates the size of the Wrights' home and was built the same year.

Ms. Bowers further explained to the Board that the Wrights' purchase price approximated the pricing in three foreclosure-related sales during the look-back period. Notwithstanding the majority's contrary finding, the Assessor obviously considered the Wrights' purchase price—otherwise, she would not have been able to determine that it approximated the foreclosure pricing and, therefore, was not indicative of the property's true

_____

[13](...continued)
     hundred dollars, and, upon being convicted, shall be removed
     from office.

[14]For the 2011 tax year, the look-back period is July 1, 2009, to June 30, 2010.

and actual value. In fact, as the Assessor explains, had she based her valuation solely on the Wrights' sales price, it would have resulted in an undervaluation in comparison with other properties that sold in their tax neighborhood during the look-back period,[15] which is another clear indication that their purchase price was considered by the Assessor. Moreover, according to Ms. Bowers's testimony, if the Wrights' purchase price had been used in valuing the tax neighborhood, the sales ratio would have been beyond the requisite plus or minus ten percent set by the Tax Commissioner because homes similar to the Wrights' home sold for $350,000 during the look-back period.[16] Ms. Bowers emphasized that

> [w]e (the Assessor's Office) cannot chase sales. We measure and list the homes based on their age, their quality construction material, the amenities, the size, and then we have to make overall adjustments to try to bring these properties between 90 and 110 percent of the sales. Mr. Wright . . . was one of the model homes. And I personally have not been in Mr. Wright's home. I offered to come out and actually review it, but in my experience every model home that I've been in does have the higher quality amenities in it. It's got the extras and the bells and whistles that other places wouldn't.[17] We do have a house

---

[15]The Assessor explains that had she used only the purchase price to establish value, the average price per square foot for the Wrights' home would be $50.64, whereas the 2,650 square foot home that sold for $210,000 would have an average price per square foot of $79.24. Such a result would clearly defeat the constitutional and legislative mandate of equal and fair taxation amongst all property owners. It further serves to demonstrate why county assessors must follow the Tax Commissioner's methodology and why the purchase price *may*, but not always, reflect a property's true and actual value.

[16]This is a reference to the home containing 4,296 square feet located in the Wrights' subdivision.

[17]Unlike the majority, I place little, if any, significance on the fact that Ms. Bowers

(continued...)

11

. . . that sold for 350[,000] which is not a model and so forth but as far as size and so forth[,] it's similar to Mr. Wright's. So we feel that our appraisal is correct using the sales that we've utilized.[18]

Ms. Bowers further explained that

[i]f we would have adjusted overall these values down to match Mr. Wright's sale, every one of these houses, these open market sales, would have been below 90%. So we would have been below market. *One sale cannot drive market* within a subdivision.

(Emphasis added.).[19]

As the majority points out, our prior law provides that the purchase price of property "'*may* be a very important element of proof where there has been an open transaction between competent parties dealing at arm's length . . . .'" *Mountain America,*

---

[17](...continued)
did not go into the Wrights' home, whether because they refused her entrance or otherwise. I suspect that more often than not, property owners decline such offers made by an assessor's office. Moreover, Mr. Wright never disputed the fact that his home is a model home or that it has the "extras and the bells and whistles that other places wouldn't."

[18]Ms. Bowers explained during her testimony that most of the sales she used were homes built in either 2009 or 2010.

[19]A disparity among taxpayers would be created if only the purchase price were used to determine appraised values. As the Assessor explains, the 2,610 square foot home that sold for $210,000 would yield an average of $79.24 per square foot and the 4,296 square foot home that sold for $350,000 would yield an average of $81.47 per square foot. However, the Wrights' 4,260 square foot home purchased for $234,000 yields an average of only $54.92 per square foot, which demonstrates why the purchase price *may* be used as evidence, but is *not* conclusive as to value. *See Mountain American*, *infra.*

*LLC v. Huffman*, 224 W.Va. 669, 687, 687 S.E.2d 768, 786 (2009) (quoting *Kline*, 174

W.Va. 369, 326 S.E.2d 715 (emphasis added).[20]  Indeed, I believe that these prior decisions

highlight this Court's recognition that there *may* be instances, such as the case *sub judice*,

where a purchase price in a purportedly arm's length transaction is *not* reflective of the

property's true and actual value. *Accord Southern Westchester Associates v. Assessor of City*

*of Yonkers*, 122 A.D.2d 212 (N.Y.1986) (recent arm's length sale is best evidence of value

for tax assessment purposes *if not explained away as extraordinary*).  In fact, "[e]ven if

---

[20]Many states agree that purchase price is ***not*** conclusive for determining market value.  *See  Tuthill v. Arkansas Cnty. Equalization Bd.*, 797 S.W.2d 439,  441 (Ark.,1990) ("the current purchase price is an important criterion of market value, but it alone does not conclusively determine the market value . . . a real bargain hunter might purchase a piece of property solely because he is getting it for less than market value, and one such isolated sale does not establish market value."); *Dennis v. Cnty. of Santa Clara*, 215 Cal.App.3d 1019, 263 Cal.Rptr. 887 (Cal.App. 1989) (purchase price may be significant but it is only the beginning and not necessarily the end of the inquiry); *O'Brien v. Bd. of Tax Review*, 362 A.2d 914, 918 (Conn. 1975) (sale price of land shortly after assessment date was competent evidence to show its fair market value, but was not controlling in determining such value); *Walker v. Trump*, 549 So. 2d 1098 (Fla. Dist. Ct. App. 4th Dist. 1989) (purchase price one of eight factors considered); *Park Esplanade Ltd. Partnership v. Williams*, 577 So.2d 1028, 1030 (La.App. 4 Cir.,1991) ("The purchase price is not the exclusive or sole basis on which to establish a value for assessment purposes."); *Arath III, Inc. v. City of Grand Rapids*, No. 233682, 2003 WL 327622 (Mich. App., Feb.11, 2003) (purchase price not presumptive true cash value of property transferred); *Schleiff v Cnty. of Freeborn*, 43 N.W.2d 265 ( Minn. 1950) (evidence of recent purchase price not conclusive as to its market value but an important element in determining such value under relevant tax valuation statutes); *Bottorf v. Clay Cnty. Bd. of Equalization*, 580 N.W.2d 561 (Neb. 1998) (sale price for property sold close to time of tax assessment is not conclusive as to value); *Venture 17, LLC v. Hasbrouck Heights*, 27 N.J.Tax 108 (N.J. Tax. Ct. 2013) (sale of property not dispositive on issue of value); *Smith v. Newberry Cnty. Assessor*, 567 S.E.2d 501 (S.C. 2002) (purchase price of property not conclusive evidence of fair market value); *West Creek Associates, LLC v. Cnty. of Goochland*, 665 S.E.2d 834 (Va. 2008) (sale price is accorded substantial weight but is not conclusive evidence of fair market value); *City of Harrisonburg v. Taubman*, 181 S.E.2d 654 (Va.1971) (sale price was not conclusive evidence of fair market value).

property is sold on tax day (the day on which it is appraised for tax purposes), there is no guarantee that the sale price equals market value." *Powell on Real Property*, § 10B.06[4][c][ii] (Michael Allan Wolf, ed., Matthew Bender).

I agree with the majority that "[t]he price paid for property in an arm's length transaction, while not conclusive, is relevant evidence of its true and actual value[.]"[21] Syl. Pt. 2, in part, *Kline v. McCloud*, 174 W.Va. 369, 326 S.E.2d 715 (1984). However, I strongly disagree with the majority's unsupportable conclusion that neither the Assessor, the Board, nor the circuit court "considered" or gave evidentiary value to the Wrights' purchase price. As discussed above, the record discredits such a conclusion and, in fact, demonstrates that the Assessor, the Board, and the circuit court each considered the Wrights' purchase price in their respective analyses.

## IV. Burden of Proof

In addition to the majority's erroneous conclusion regarding the consideration and evidentiary value given to the Wrights' purchase price, the majority also focuses on

---

[21]I observe that Rule 401 of the West Virginia Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or *less probable* than it would be without the evidence." [Emphasis added.]. Here, the Wrights' purchase price simply made it *less probable* that said price was reflective of their home's true and actual value, particularly where the Assessor determined that their purchase price was in line with the foreclosure sales in their tax neighborhood during the look-back period.

14

evidence which they say the Assessor should have presented before the Board. In doing so,

the majority completely and utterly disregards the fact that the burden of proof was on the

Wrights–*not the Assessor*–to show that the assessment of their property was erroneous.

> "'As a general rule, there is a presumption that valuations for taxation purposes fixed by an assessor are correct. . . .The burden is on the taxpayer challenging the assessments to demonstrate by *clear and convincing evidence* that the tax assessment is erroneous.' Syllabus point 2, in part, *Western Pocahontas Properties Ltd. v. County Commission of Wetzel County,* 189 W.Va. 322, 431 S.E.2d 661 (1993)." Syllabus Point 8, *Bayer MaterialScience, LLC v. State Tax Commissioner,* 223 W.Va. 38, 672 S.E.2d 174 (2008).

*Mountain America,* 224 W.Va. at 771, 687 S.E.2d at 772, syl. pt. 9 (emphasis added). As this

Court has emphasized, "[c]lear . . . and convincing proof . . . is the highest possible standard

of civil proof defined as 'that measure or degree of proof which will produce in the mind of

the trier of facts a firm belief or conviction as to the allegations sought to be established.'"

*Webb v. WV Bd. of Medicine*, 212 W.Va. 149, 156, 569 S.E.2d 225, 232 (2002) (internal

citations omitted).[22] We have previously addressed taxpayers' complaints concerning this

___

[22]*See also Maxwell v. Carl Bierbaum, Inc.,* 893 S.W.2d 346, 348 (Ark. 1995) ("Clear and convincing evidence has been defined as proof so clear, direct, weighty, and convincing as to enable the fact finder to come to a clear conviction, without hesitation, of the matter asserted (internal citation omitted); it is that degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established."); *Slomowitz v. Walker*, 429 So.2d 797, 800 (Fla.Ct.App.1983) ("[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.").

heavy evidentiary burden and, in doing so, have reaffirmed that the taxpayer at all times bears the burden of proof in seeking relief from an allegedly erroneous tax assessment.

In *In re Tax Assessment of Foster Foundation's Woodlands Retirement*, 223 W.Va. 14, 672 S.E.2d 150 (2008), the taxpayer challenged the clear and convincing evidentiary burden, as well as its corresponding burden of persuasion insofar as it complained that "neither the Assessor nor the [County] Commission was required to present evidence of a specific type to prove the correctness of their assessments." *Id.* at 29, 672 S.E.2d at 165. As we explained,

> Requiring the party bringing a claim for relief to bear the burden of persuasion . . . is consistent with our jurisprudence. "It is a well-established rule of law that in civil actions the party seeking relief must prove his right thereto[.]" *Boury v. Hamm*, 156 W.Va. 44, 52, 190 S.E.2d 13, 18 (1972). Therefore,
>
> > when a plaintiff comes into court in a civil action he must, to justify a verdict in his favor, establish his case. . . . The *burden of proof*, meaning the duty to establish the truth of the claim . . . , rests upon him from the beginning, and *does not shift*, as does the duty of presenting all the evidence bearing on the issue as the case progresses.
>
> *Burk v. Huntington Dev. & Gas Co.*, 133 W.Va. 817, 830, 58 S.E.2d 574, 581 (1950), *modified on other grounds, Foster v. City of Keyser*, 202 W.Va. 1, 501 S.E.2d 165 (1997). Moreover,
>
> > [a]s a general matter, the burden of proof consists of two components: burden of production and burden of persuasion. The burden of persuasion requires the party upon whom it is placed, to

16

> convince the trier of fact . . . on a given issue. When a party has the burden of persuasion on an issue, *that burden does not shift. . . .*

*Mayhew v. Mayhew*, 205 W.Va. 490, 497 n.15, 519 S.E.2d 188, 195 n.15 (1999) (citations omitted). . . .

> Thus, as the party seeking relief from the allegedly erroneous tax assessment . . . bears the burden of proving its entitlement to relief. *See Boury*, 156 W.Va. at 52, 190 S.E.2d at 18. To sustain this burden, the Foundation must present clear and convincing evidence. *The burden of persuasion rests with the Foundation to prove that its tax assessment was erroneous; it does not lie with the Assessor or the Commission **nor does it shift thereto***.

*Foster Foundation*, 223 W.Va. at 29, 672 S.E.2d at 165 (emphasis added). Thus, while the majority seems to imply that the burden of proof shifted to the Assessor once the Wrights presented their purchase price to the Board, the majority is flat out wrong. *Id.*

## V. The Wrights' Evidence

Because the evidentiary burden was on the Wrights at all times, instead of focusing upon what evidence the Assessor did not present, as the majority has done, let us examine, instead, the Wrights' evidence to see why, as I believe, they failed to meet their heavy evidentiary burden.

The Wrights offered two pieces of evidence before the Board: (1) a spreadsheet they prepared averaging the prices of ten sales in their subdivision during the look-back

17

period and (2) a copy of the real estate appraisal prepared in conjunction with the purchase of their home. As the circuit court correctly pointed out in its order upholding the Assessor's valuation, the spreadsheet "sheds no real light on the issue[]" because it does not "differentiate as to which properties were sold as a result of foreclosures or what the square footage[s] of the homes were sufficient to determine a different value," nor did it reflect the size, age, or condition of the homes. As Ms. Bowers explained to the Board,

> This is a reappraisal to equalize property values based on the value of each individual property, considering the size of the lot, the size of the square footage of the home, the amenities in the home. If you took an average, I mean actually it would make my job a lot easier if I could just take an average price and then punch in those numbers. But we have to physically measure and list each one of these houses. We use these sales as guidelines to make overall adjustments in the [tax] neighborhood based on the individual home because of the differences in the individual homes. So there's no way that we could just take an average.
> • • • •
> I worked with the State Tax Department and I've never been told to do an average. Like I say we can't actually set individual values. We have to measure and list the house according to the amenities of the house and make overall adjustments to that neighborhood based on those sales.

The only other evidence offered by the Wrights was the residential appraisal of their home prepared at the behest of their mortgage lender. As the circuit court aptly observed, the Wrights' appraiser had to go outside the Wrights' tax neighborhood in order to find similar sale prices for comparably sized homes, while simultaneously ignoring the similarly sized home in the Wrights' subdivision that sold for $350,000. Because the

18

Wrights did not offer the testimony of their appraiser, the Board did not have the opportunity to question the appraiser and seek an explanation in this regard, thus leaving the Board with a "hearsay document," as the circuit court observed. *See Killen*, 170 W.Va. at 604, 295 S.E.2d at 691, syl. pt. 8, in part ("An objection to any assessment may be sustained only upon the presentation of competent evidence, such as that *equivalent to testimony of qualified appraisers*, that the property has been . . . wrongly assessed.") (emphasis added). Consistent with the pertinent statutes, regulations, and Administrative Notice discussed herein, the circuit court deftly explained that

> [u]nlike appraisals based upon "comparable sales" done in a real estate context where only . . . properties of similar style and size are considered . . . for tax purposes all arms length sales are considered and converted into an average square-foot value for residential space. Such a computation allows an averaging of values of new homes and older homes, of one bedroom homes with five bedroom homes, well maintained homes and homes in disrepair, all based on their square-foot value. The determinations made regarding grade, age, condition, etc., of a particular property in question are then used to bring the appraisal of that property within 10% more or less of the range of the determined average residential square foot value.

Had the Wrights' appraiser used comparable sales of similarly sized homes in the Wrights' tax neighborhood during the look-back period, I believe that such an appraisal would have had significant evidentiary value. However, their appraiser did not do so.

Lastly and contrary to the majority's reasoning, it was the Wrights who bore the burden of presenting evidence to the Board explaining their "good deal." Perhaps they

could have obtained an affidavit from their sellers explaining why the sale of their home to the Wrights was a valid arm's length transaction even though the purchase price was so clearly below market value. Or, perhaps the Wrights could have offered the testimony of a real estate appraiser to explain why their purchase price was indicative of their home's true and actual value when other sales in the tax neighborhood during the look-back period demonstrated to the contrary. The Wrights did none of these things.

As this Court has previously held, "[o]nce an assessor has made an assessment, the valuation placed upon the property by the assessor is accorded *great deference* and is *presumed to be correct*." *Foster Foundation*, 223 W.Va at 33, 672 S.E.2d at 170 (emphasis added). Indeed, "[a]n assessment made by a board of review and equalization and approved by the circuit court will not be reversed when supported by substantial evidence unless plainly wrong." Syl. Pt. 3, *Western Pocahontas Properties Ltd. v. Cnty. Comm'n of Wetzel Cnty.*, 189 W.Va. 322, 431 S.E.2d 661 (1993) (internal quotations and citations omitted). Here, the circuit court correctly concluded that

> [b]ecause the [Wrights] did not offer . . . the clear and convincing evidence it would be their burden to provide, the Court must assume[23] that this appraised value is in line with the State Tax Department mandated range of plus or minus 10% of [the] current tax year's average, arm's length, fair market sales

[23]*See Foster Foundation*, 223 W.Va. 14, 33, 672 S.E.2d 150, 170 ("the valuation placed upon the property by the assessor is accorded *great deference* and is *presumed to be correct*." (Emphasis added.)).

for the tax neighborhood when construed through the lens of valuation based upon the square foot.

## VI. Conclusion

It is abundantly clear from the record that the Wrights have simply failed to sustain their heavy burden of proof in this matter. Based on the evidence in the record and in contemplation of the Tax Commissioner's mandated methodology for valuing residential real property for ad valorem tax purposes in this State, I am compelled to conclude, under the facts and circumstances of this case, that the circuit court did not abuse its discretion[24] in affirming the Board's decision to uphold the Assessor's valuation of the Wrights' home, which is not "plainly wrong." *Id.* Moreover, nothing in this dissent should be interpreted as discouraging taxpayers from challenging their ad valorem tax assessments. Rather, I am compelled to dissent because I believe the majority has misinterpreted the evidence, has disregarded the Tax Commissioner's directives concerning the methodology for appraising real property for tax assessment purposes, and has wrongfully shifted the burden of proof to

---

[24]"This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard." Syl. Pt. 1, in part, *Foster Foundation*, 223 W.Va. 14, 672 S.E.2d 150.

the Assessor.  Therefore, I respectfully dissent from the majority's decision in this case.[25]

---

[25]The majority indicates that "[o]n remand, the parties may introduce all relevant evidence regarding the true and actual value of the property." It appears that the circuit court will need to be guided in this regard by West Virginia Code § 11-3-25(c) (2013), which allows for the taking of additional evidence before the Board in certain limited circumstances, which may or may not be present in the case at bar.