# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

Lee Trace, LLC,
Petitioner Below, Petitioner

vs)  No. 16-0239 (Berkeley County 15-AA-5)

Berkeley County Council as
Board of Review and Equalization,
Berkeley County Council and Larry Hess,
as assessor for Berkeley County, West Virginia,
Respondents Below, Respondents

**FILED**

**April 28, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Lee Trace, LLC ("Lee Trace"), by counsel Thomas Moore Lawson and Kristopher R. McClellan, appeals the order of the Circuit Court of Berkeley County, entered on February 9, 2016, denying its petition for writ of certiorari regarding the Berkeley County Council Board of Review and Equalization's denial of an adjustment to the 2015 real property taxes on petitioner's apartment complex. Respondents Assessor Larry Hess, Berkeley County Council, and Berkeley County Council as the Board of Review and Equalization ("the Board") appear by counsel Norwood Bentley, III.[1]

---

[1] Pending before the Court is petitioner's motion, filed on February 2, 2017, to supplement the record and file a supplemental brief on the basis of evidence discovered after the institution of this appeal. Petitioner represents that it discovered, on December 9, 2016, "for the first time that [respondents] never produced the entire 2016 [c]ommercial [r]eview [d]ocument for the [p]roperty and had apparently purposefully withheld key portions of the document." Respondents have filed no response to petitioner's motion. We note that petitioner's request for relief is that we consider this evidence, and not that we remand to the circuit court for its consideration. The request, inexplicably made nearly two months after discovery of the information in question, is inappropriate for this forum.

> Although our review of the record from a summary judgment proceeding is *de novo*, this Court for obvious reasons, will not consider evidence or arguments that were not presented to the circuit court for its consideration in ruling on the motion. To be clear, our review is limited to the record as it stood before the circuit court at the time of its ruling.

*Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.*, 196 W. Va. 692, 700, 474 S.E.2d 872, 880 (1996). Though the matter before us is an appeal from a circuit court order approving the assessment of a board of review and equalization, rather than an appeal from a summary (cont'd . . . .)

1

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner owns a 156-unit apartment complex (built in 2009) on a 17.02 acre site in Martinsburg, West Virginia ("the property"). Our familiarity with the property originates with the appeal yielding our per curiam opinion *Lee Trace LLC v. Raynes*, 232 W.Va. 183, 751 S.E.2d 703 (2013) ("*Lee Trace I*"). In that case, we considered the 2010 and 2011 assessments of the property. We ultimately reversed and remanded the assessments to the circuit court for consideration of both assessments, because petitioner had not received adequate notice of the right to appeal (the 2010 assessment), and because the Board had abused its discretion in applying methodology that was inconsistent with the directives set forth in the Code of State Rules (the 2011 assessment). Subsequent to the remand, we were asked to revisit the 2010 assessment, and we did so in *Lee Trace, LLC v. Hess*, No. 14-0962, 2015 WL 7628718 (W.Va. Nov. 20, 2015)(memorandum decision)("*Lee Trace II*"), wherein we upheld the circuit court's affirmation of the Board's ruling.

Thereafter, for the 2015 tax year, the assessor valued the property at $11,091,600, resulting in an assessed value of $6,654,960.[2] Petitioner appealed the assessment to the Board, which conducted a hearing in February of 2015. At the hearing, petitioner's expert, L. Steven Noble, testified that he reached a value of $7,000,000 through the cost approach, and he believed the assessed value was $4,200,000. He further testified that he verified his appraisal using the income approach, and he also testified that the assessor had failed to equalize petitioner's property with comparable properties within the county. Mr. Noble testified that there had been market changes since he first testified in a separate hearing conducted by the Board, several years prior, regarding the 2010 assessment of the property. The changes include the construction of two large apartment complexes—Stony Pointe (built about two years after petitioner's

---

judgment order, our concern is the same. Neither the circuit court nor the Board had the opportunity to assess this evidence, and we will not commandeer the functions of a lower tribunal. Accordingly, the motion is denied.

[2] West Virginia Code § 11-3-1(a) provides:

> All property, except public service businesses assessed pursuant to article six of this chapter, shall be assessed annually as of July 1 at sixty percent of its true and actual value; that is to say, at the price for which the property would sell if voluntarily offered for sale by the owner thereof, upon the terms as the property, the value of which is sought to be ascertained, is usually sold, and not the price which might be realized if the property were sold at a forced sale.

property) and The Reserves—now potentially available for comparison purposes. Mr. Noble stated that he did not emphasize land values, but instead focused on construction cost and value of improvements. By way of example, Mr. Noble explained that petitioner had a higher assessment cost per unit than Stony Pointe. He expressed his opinion that the assessor's assessment yields an "illogical" result because Stony Pointe collects higher rent and income, but has a 7% lower assessment than petitioner's property. He testified that, in addition, petitioner was effectively assessed at 11.7% of gross value, while The Reserves was effectively assessed at 8.3% of its value. According to Mr. Noble, the assessor considered only physical depreciation and not economic obsolescence.

In contrast, Tamara Edgar, a commercial appraiser employed by the assessor's office, testified that she had appraised the property on behalf of the assessor's office, and that she considered the income, sales, and cost approaches in doing so. However, she testified that she was unable to develop a capitalization, or "cap," rate for the income approach because, though the assessor sent requests for information from properties deemed to have been sold in arm's length transactions, the assessor did not receive adequate information in response.[3] Ms. Edgar testified that she considered differences between petitioner's property and Stony Pointe, such as Stony Pointe's lack of a pool and the difference in square footage of the units. She testified that functional obsolescence was considered, but that it was considered in traditional terms, such as whether a forty-year-old building functions at the same level as a modern building. She explained:

> The physical depreciation is based upon the age of the building and upon the condition of the building.
>
> I mean we did consider economic obsolescence.
>
> But based upon the sales that we had of other apartment buildings—and we did have other apartment buildings that did sell, but they were nowhere near the size of the Lee Trace complex.
>
> But all of the other sales that we had sold for more than we had them appraised for. So it was determined that we really did not need to account for economic obsolescence at this time. . . . We did not allow for any this year based upon the information that we received.

---

[3] The "income approach" is set forth in W.Va. C.S.R. § 110–1P–2.2.1.2 as follows:

> Income approach.—A property's present worth is directly related to its ability to produce an income over the life of the property. The selection of an overall capitalization rate will be derived from current available market data by dividing annual net income by the current selling price of comparable properties. The present fair market value of the property shall then be determined by dividing the annual economic rent by the capitalization rate.

3

Ms. Edgar further testified that the assessor's office uses a computerized system ("the IAS system") for equalization purposes.

Respondent Assessor Hess also testified. He explained that the cost approach was used "[a]nd the way it's designed, it absolutely equalizes assessments." He agreed with Ms. Edgar that the assessor's office was not able to obtain sufficient information to use the income approach.[4] Respondent Assessor also testified about another property, The Cottages, which he said is now approximately twenty years old.[5] Respondent Assessor testified:

> . . . [W]e have analyzed all three approaches [income, sales, and cost]. And we do it with all of the information that we can get.
>
> And so, you know, we absolutely have treated all of the income producing properties equal with the cost approach and looked at The Cottages of Martinsburg based on our cost approach.
>
> And using the same system, the grading system, the depreciation system, the physical and functional, all of that stuff prices out The Cottages right under— you know, what it sold for.
>
> So the system actually works. Those same variables was (sic) applied to Lee Trace. That shows the market value.
>
> I mean, all of the other properties have the same thing applied to them, you know.
>
> So it's absolutely a fair and equal assessment across the board.

Respondent Assessor also testified that the assessor's office uses a "grading system" to compare properties based on quality of construction and architecture; petitioner's property is graded C+ ("a little bit above average") and Stony Point is a C ("average"). The difference between a C and a C+, he said, is "an 8 percent increase."

The Board denied petitioner's appeal. Petitioner filed an appeal with the Circuit Court of Berkeley County, asserting three assignments of error: that (1) the Board failed to give proper notice of the 2010 assessment, and, thus, no subsequent assessment supersedes the 2009 assessment of $677,050; (2) the Board failed to consider required factors such as income, physical deterioration, and obsolescence; and (3) the Board failed to equalize the property with comparable properties. The circuit court entered its order denying the appeal on February 16,

---

[4] As previously noted, Ms. Edgar testified about the inability to develop a cap rate or use the income approach.

[5] Ms. Edgar testified that this property is "significantly smaller" than petitioner's property, as it consists of 120 units.

2016, explaining that: (1) *Lee Trace II* upheld the 2010 assessment when the Court found that the remand to the Board ordered in *Lee Trace I* remedied the defective notice of the 2010 assessment; (2) *Lee Trace I* addressed the discretion of the assessor in choosing the method of appraisal, Ms. Edgar's testimony demonstrated that the assessor considered physical deterioration, petitioner failed to present evidence of decreased demand that would necessitate a review of economic obsolescence, and petitioner presented no evidence that the assessor did not consider functional obsolescence; and (3) petitioner failed to establish by clear and convincing evidence that the assessor caused unequal, non-uniform assessments.

On appeal, petitioner asserts seven assignments of error: that the circuit court erred in (1) finding that the assessor equalized the property's taxes with those of properties in the same class as required by Article X, § 9 of the West Virginia Constitution, though the assessor "admits that he did not have the information necessary to equalize property taxes"; (2) making factual findings contrary to expert testimony and undisputed record evidence; (3) finding that there was no evidence of intentional or systematic overvaluation of the property relative to comparable properties; (4) applying an "effectively irrebuttable presumption of correctness" in favor of the assessor, thus depriving petitioner of due process; (5) finding that the property valuation set by the assessor is accorded great deference and is presumed to be correct in the face of evidence to the contrary; (6) finding that the assessor considered the depreciation factors required by the Code of State Rules when applying the cost approach to value the property in the face of evidence to the contrary; and (7) finding that the assessor need not consider the property's income or perform an income approach analysis.

We employ the same standard of review that we applied when these parties previously appeared before us.

> "'This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*.' Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996)." Syllabus Point 1, *Foster Found.*, 223 W.Va. 14, 672 S.E.2d 150 (2008). This Court has repeatedly recognized that

> > "'[a]n assessment made by a board of review and equalization and approved by the circuit court will not be reversed when supported by substantial evidence unless plainly wrong.' Syllabus Point 1, *West Penn Power Co. v. Board of Review and Equalization*, 112 W.Va. 442, 164 S.E. 862 (1932) (other internal citations omitted)." "Syllabus Point 3, *In re: Tax Assessment of Foster Foundation's Woodlands Retirement Community*, 223 W.Va. 14, 672 S.E.2d 150 (2008)."

> Syllabus Point 2, *Mountain America LLC v. Huffman*, 224 W.Va. 669, 687 S.E.2d 768. The interpretation of a statute, or the constitutionality of a statute, as written or as applied, as in this case, presents a purely legal question subject to *de novo* review. *Foster Found.*, 223 W.Va. at 18–19, 672 S.E.2d at 154–55 (citing

5

*Appalachian Power Co. v. State Tax Dept. of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995)); *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

*Lee Trace I*, 232 W.Va. at 189-90, 751 S.E.2d at 709-10.

Guided by the principles set forth above, we consider petitioner's assignments of error. We also consider petitioner's arguments in the light of basic property tax rubric:

> Article X, Section 1 of the West Virginia Constitution requires that "all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law." For taxation purposes, property is to be assessed "at its true and actual value." W.Va. Code § 11–3–1. "True and actual value" has been defined as "market value" and "the price paid for property in an arm's length transaction." *Kline v. McCloud*, 174 W.Va. [369] at 372, 326 S.E.2d [715] at 719 [(1984)]. "The price paid for property is not conclusive as to value, but it may be a very important element of proof where there has been an open transaction between competent parties dealing at arm's length as appears from the evidence . . . In many jurisdictions, evidence of current market value is given substantial, if not conclusive, weight." *Id*. (citations omitted). A taxpayer whose property is assessed at true and actual value must show *more than* the fact that other property is valued at less than true and actual value in order to obtain relief under Article X, Section I. *Id*. (emphasis added). "To obtain relief, he must prove that the undervaluation was intentional and systematic." *Id*.

*Mountain America, LLC v. Huffman*, 224 W.Va. 669, 686-87, 687 S.E.2d 768, 785-86 (2009).

We begin with petitioner's first assignment of error, wherein it argues that the circuit court erred in finding that the property was equalized. Our consideration of this issue necessarily implicates petitioner's second assignment of error—that the circuit court made factual findings contrary to expert testimony and "undisputed" record evidence—and its third assignment of error—that the circuit court erroneously found that there was no evidence of intentional or systematic overvaluation of the property relative to comparable properties. Petitioner explains the basis for its arguments as follows:

> The [a]ssessor has admitted to using a hybrid income approach prohibited by this Court in [*Lee Trace I*] to value other apartment properties over the course of multiple assessments and has admitted that this approach reduced the assessments on those properties. [Footnote omitted.] [Petitioner] has presented evidence through documents and the testimony of a licensed, certified expert real estate appraiser that the tax burden on the [p]roperty is not equalized with the taxes of comparable apartment properties in Berkeley County. A.R. 118-262. In particular, for the 2015 [a]ssessment, Mr. Noble explained that [petitioner's] real estate tax

load per apartment unit is, on average, 33% higher than for the next three closest competitors, Stony Pointe, The Reserves, and Spring Mills.[6]

Petitioner characterizes the points made in the preceding paragraph as demonstrative of a "repeated, intentional, and systematic application of a more favorable valuation method" to its competitors' properties.[7] Petitioner also relies on the assessor's testimony that he did not have the necessary information to make a fair and equitable assessment using the income approach to insinuate that the assessor was wholly unable to make a fair and equitable assessment. The entirety of Respondent Assessor's testimony on this matter, as cited by petitioner, was:

> And, like I say, regardless of the income, we have the sole discretion to use which approach we use. And that's the cost approach. That's the best approach we could use right now. I mean you can talk all you want to about the income. And the [C]ourt says we have a right to pick. If we don't use it—we just have to consider it, analyze it, and decide whether we want to use it or not. *And we don't have the information enough to make any sense from it. So I can't fairly assess all of the apartments,* all the retail stores by just that little bit of information. It just doesn't give me enough information to make any sense out of it.

(Emphasis supplied by petitioner.) Petitioner argues that the accentuated portion of this testimony provides the smoking gun. We disagree. In context, Respondent Assessor's testimony shows that he considered whether the income approach could fairly be applied to similarly-situated taxpayers and determined that it could not. This matter was sufficiently resolved in *Lee Trace I*, wherein we clarified that "an assessor need not perform a useless act of considering an appraisal method where the assessor does not have sufficient data to perform that appraisal method."[8] *Lee Trace I*, 232 W.Va. at 193, 751 S.E.2d at 713. (For this reason, we take

---

[6] We reiterate that "[a] taxpayer whose property is assessed at true and actual value [must] show more than the fact that other property is valued at less than true and actual value" in order to obtain relief under Article X, Section I. *Kline v. McCloud*, 174 W.Va. 369, 372, 326 S.E.2d 715, 719 (1984).

[7] W.Va. C.S.R. § 110–1P–2.2.1 (1991) recognizes three different appraisal methods for determining the fair market value of "commercial and industrial real and personal property for ad valorem tax purposes." This subsection provides: ". . . the Tax Commissioner will consider and use, where applicable, three generally accepted approaches to value: (A) cost, (B) income, and (C) market data."

[8] Petitioner argues that, because at least one other sale of similar property occurred, respondents had information available to develop a cap rate and employ the income approach. We note, however, that the assessor also must know the property's annual net income; though petitioner argues it provided its own income information, there is no evidence that respondents were provided income information by properties that were sold. In fact, Respondent Assessor and Ms. Edgar testified to the contrary. The circuit court noted that Mr. Noble reached the cap
(cont'd . . . .)

petitioner's assignments of error out of turn, to briefly reject its seventh, wherein it argues that the circuit court incorrectly concluded that the assessor need not consider the property's income or perform an income approach analysis. The testimony of Respondent Assessor and Ms. Edgar shows that respondents did consider the income approach, as state rules require, and determined it was not the best approach for the assessment.)

The balance of petitioner's arguments is unpersuasive for other reasons. First, in support of its statement that it "has presented evidence through documents and the testimony of a licensed, certified expert real estate appraiser that the tax burden on the [p]roperty is not equalized with the taxes of comparable apartment properties," petitioner broadly cites one-hundred forty-four pages of transcript. Such a general reference falls short of our requirement, found in Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure, that arguments "contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal." It further offends our frequent admonition that "[j]udges are not like pigs, hunting for truffles" in the pleadings before us. *State v. Honaker*, 193 W.Va. 51, 56 n. 4, 454 S.E.2d 96, 101 n. 4 (1994) *quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991). Second, we note that petitioner references a number of certified records, presumably from appeals of other assessments, and not contained in the appendix record on appeal, to support its assertion that other properties have benefitted from an illegal "hybrid" approach to valuation.[9] If we are not hunters of truffles in the documents before us, we certainly will not become gatherers of morsels hidden in dusty file rooms far afield. Petitioner's proffers are deficient for these reasons.

Having addressed petitioner's first, second, third, and seventh assignments of error, we proceed. Petitioner's fourth assignment of error asserts that the circuit court applied an "effectively irrebuttable presumption of correctness" in favor of the assessor, thus depriving petitioner of due process. Its fifth assignment of error asserts that the circuit court was wrong in acting under the premise that the property valuation set by the assessor is accorded great deference "and is presumed to be correct when the [a]ssessor admitted that the assessment was

rate that he used by calculating information from outside markets, and petitioner has not disputed that finding.

[9] In a footnote, petitioner purports to "incorporate[] by reference" the "[c]ertified [r]ecords for the respective [c]ircuit [c]ourt cases in which the appeals for [various] assessments are pending. . . ." All of the assessments mentioned by petitioner predate the 2015 assessment now before us, and some appear to predate our decision in *Lee Trace I*. It is thus not clear how those records pertain to the instant appeal. Moreover, parties are not entitled to our consideration of evidence not consigned to the appendix record on appeal, inasmuch as Rule 7(a) of our Rules of Appellate Procedure clarifies that "[a]n appendix must contain accurate reproductions of the papers and exhibits submitted to the lower court, administrative agency or other tribunal. . . ." Therefore, there is no evidence before us that respondents favored other taxpayers with a hybrid method of valuation for the 2015 assessments.

not proper." We have explained that, "'[a]s a general rule, there is a presumption that valuations for taxation purposes fixed by an assessor are correct. . . . The burden is on the taxpayer challenging the assessments to demonstrate by clear and convincing evidence that the tax assessment is erroneous.' Syllabus point 2, in part, *Western Pocahontas Properties Ltd. v. County Commission of Wetzel County*, 189 W.Va. 322, 431 S.E.2d 661 (1993)." Syl. Pt. 8, *Bayer MaterialScience, LLC, v. State Tax Commissioner*, 223 W.Va. 38, 672 S.E.2d 174 (2008); *See also* Syl. Pt. 5, in part, *In re: Tax Assessment of Foster Foundation's Woodlands Retirement Community*, 223 W.Va. 14, 672 S.E.2d 150 (Stating that "[a] taxpayer challenging an assessor's tax assessment must prove by clear and convincing evidence that such assessment is erroneous."). Petitioner does not take issue with this established standard but, rather, argues that the circuit court ignored evidence that the property was not equalized with comparable properties, thus imposing "a presumption of correctness that no taxpayer could overcome." Inasmuch as petitioner's arguments are wholly dependent on our agreeing that the circuit court erroneously failed to consider evidence, we reject them for the reasons set forth above.

Finally, we evaluate petitioner's sixth assignment of error, wherein it argues that the circuit court incorrectly concluded that the assessor considered the depreciation factors required by the Code of State Rules when applying the cost approach to value the property. Where the cost approach to assessments is concerned, the assessor must "consider" three types of depreciation: physical deterioration, functional obsolescence, and economic obsolescence. *See* W.Va. C.S.R. § 110–1P–2.2.1.1. Interpreting this rule, we have clarified that it

> does not require . . . any adjustment to the valuations made regarding property because of physical deterioration, functional obsolescence and economic obsolescence. . . . Rather, all that is required . . . in applying the cost approach to valuation is that [one] will think about or contemplate [the] three types of depreciation. . . .

*Century Aluminum of W. Va., Inc. v. Jackson Cty. Comm'n*, 229 W. Va. 215, 224–25, 728 S.E.2d 99, 108–09 (2012).

The basis for petitioner's argument with respect to physical depreciation and functional obsolescence is that Respondent Assessor provided no evidence that these factors were considered, except insofar as he testified that the IAS system generated physical depreciation based on numbers that were "plugged in." Petitioner argues that Ms. Edgar testified that she "did not need to account for economic obsolescence" because other properties in the area sold for values above the appraisal rates. We note again that "[a] taxpayer challenging an assessor's tax assessment must prove by clear and convincing evidence that such tax assessment is erroneous." Syl. Pt. 5, in part, *In re Tax Assessment of Foster Found.'s Woodlands Ret. Cty.*, 223 W.Va. at 16, 672 S.E.2d at 152. It is insufficient, then, for petitioner to assert that it has met its burden of proof based on the absence of evidence. We note, as well, that the testimony cited by petitioner does not provide evidence that Respondent Assessor did not consider these factors as required by *Century Aluminum*. In fact, the circuit court concluded that Respondent Assessor "did consider all three forms of depreciation, and explained why no adjustments were made for economic and functional obsolescence[,]" and further concluded that Respondent Assessor "adjusted for

9

[physical depreciation] by reducing the replacement value of the complex." In light of the evidence before us, we find no error in the circuit court's conclusion.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** April 28, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker